In the Matter of PENN CENTRAL
TRANSPORTATION COMPANY,
Debtor.

In re APPLICATIONS FOR ALLOW-
ANCE UNDER § 77(c)(12).

Bankruptcy No. 70–347.

United States District Court,
E. D. Pennsylvania.

July 23, 1982.

OPINION AND ORDERS NOS. 4152
THRU 4156

FULLAM, District Judge.

Section 77(c)(12) of the Bankruptcy Act provides:

"[T]he judge may make an allowance, to be paid out of the debtor's estate, for the actual and reasonable expenses (including reasonable attorneys fees) incurred in connection with the proceedings and the plan by parties in interest. . . ."

This Opinion deals with the applications of five of the more active participants in the Penn Central reorganization for such allowances. The applications now before the Court are made by or on behalf of the following: Penn Central Company, which was the owner of all of the Debtor's common stock; the Institutional Investors, a group of insurance companies; Citibank, as agent for a group of 53 lending institutions; the Robinson petitioners, a small group of shareholders of Penn Central Company; and the Trustee of the New York, New Haven & Hartford Railroad ("New Haven Trustee"). The amounts requested by these five applicants aggregate more than $26 million.

The Trustees of the Debtor ("the Trustees") expressed their views concerning the subject matter of these applications before the consummation of the Plan; and, at the invitation of the Court, the Securities &

Exchange Commission and the Interstate Commerce Commission have commented on the legal and factual issues presented by the applications. While some of these comments can be regarded as questioning certain items and certain legal theories advanced in support of the applications, no actual formal objection to any of the applications has been filed. The absence of significant contest does not, however, relieve this Court of the responsibility of carefully examining the applications to ensure that only permissible allowances are approved.

■ In order to be eligible for reimbursement pursuant to § 77(c)(12), the expenses (including counsel fees) incurred by creditors and other parties in interest must be shown to have been of benefit to the estate. *Woods v. City Nat'l Bank & Trust Co.,* 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820 (1941). In addition, of course, the amounts of such allowances must be reasonable.

■ In determining whether particular activities for which reimbursement is sought can properly be characterized as having benefitted the estate, the Court is faced, not with applying a litmus-like test, but with exercising a prudent and realistic judgment. Each reorganization must be viewed in its totality, and each applicant's efforts must be assessed in the context of the entire reorganization process. As stated by the SEC in its comments (Doc. No. 16669, at p. 5):

> "[A]ctivities or services which are found to be solely, or primarily, in the interests of certain creditors or stockholders and in no way beneficial to the administration of the estate or to a fair and equitable and feasible plan were not intended to be compensated or reimbursed from the debtor's estate."

To put the matter succinctly, costs associated with activities helpful to the reorganization process are reimbursable but costs associated with advancing a party's own interests are not. This distinction is easily stated, but not always easily applied, as the discussion of individual applications later in this Opinion demonstrates.

Of course, achieving a reorganization is in the interests of all creditors, and every party to the proceeding was undoubtedly motivated by self-interest in pursuing that goal. The distinction to be made is between activities undertaken solely for the private interest of the creditor, and activities which, while beneficial to the private interests of the creditor, also benefitted the reorganization process.

Once the threshold requirement of benefit-to-the-estate-and-its-reorganization has been met, there arises the question whether, in fixing the amount of the allowance, the degree of benefit to the estate is a factor to be considered and, if so, how it enters into the calculus.

In approving compensation of counsel to the Trustees, pursuant to § (c)(2) of the Act, the Court was called upon to determine the level of counsel's compensation. In theory, and in most cases in actuality, the present inquiry is subtly different: the level of compensation of counsel has already been determined, and paid, by the petitioning creditor; the Court is required merely to determine that the amount paid did not exceed the limits of reasonableness, and is thus properly reimbursable. Thus, in the usual situation under (c)(12), while counsel's standing, the quality of the work performed, degree of difficulty, etc., would presumably have been taken into account by the attorney and his client in their own arrangements, it is unlikely that the extent of benefit to the Debtor's estate or the reorganization process would have much to do with the matter. Moreover, since (c)(12) contemplates reimbursement only for counsel fees *actually* incurred, the statute provides no basis for implementing a decision by the Court that, because counsel's efforts greatly benefitted the reorganization, the fee should have been higher.

Unfortunately, this theoretical distinction between (c)(2) and (c)(12) applications does not, as practical matter, permit the Court to avoid the .question whether benefit to the estate should be quantified and taken into account in approving allowances under (c)(12), for at least two reasons: (1) in some

instances, the fees previously paid to their counsel by the claimants, for which reimbursement is now sought, were fixed at relatively high levels, and can be approved for reimbursement only if particular benefit to the reorganization process can be taken into account; and (2) in other instances, counsel have not yet been paid, and the attorney-client arrangements contemplate payment in whatever amount this Court approves for reimbursement under (c)(12). Thus, in the final analysis, the Court is required to consider all of the factors which properly bear upon the reasonableness of counsel fees.

The starting point is the amount of time expended by counsel, multiplied by the appropriate hourly rates. This is the basis on which special counsel to the Trustees have been compensated, *see In re Penn Central Trans. Co.,* 440 F.Supp. 569 (E.D.Pa.1977), and has been generally adhered to (with slight modification in certain instances, as for example where a law firm was engaged to conduct specific litigation warranting some increase). The specific fee structure governing compensation of special counsel is as follows: For the period through September 1976, $90 per hour for partners, $60 for associates, and $15 for others (clerks and paralegals); for the period from October 1976 through December 1977, $100, $60 and $20, respectively; and for later periods, $110, $70 and $25, respectively. (This hourly fee structure will be referred to herein as the "special counsel rates").

To the extent that the present applications seek an award or reimbursement of counsel fees, the special counsel rates will be used as a sort of benchmark, but all of the traditionally accepted norms for awarding attorneys fees will be taken into account. *See,* particularly Disciplinary Rule 2–106(B) of the American Bar Association Code of Professional Responsibility, and Judge Anderson's opinion in *In re N.Y., N.H. & H.R.R. Co.,* 421 F.Supp. 249 (D.Conn.1976), *aff'd,* 567 F.2d 166 (2d Cir.), *cert. denied,* 434 U.S. 833, 98 S.Ct. 120, 54 L.Ed.2d 94 (1977).

In evaluating these applications, I have concluded that the extent to which the efforts of counsel were of benefit to the Debtor's estate and its reorganization should be taken into account, but I flatly reject the measurements of these benefits suggested by some of the pending applications.

The fact that counsel played a part, along with many others, in preserving or enhancing asset values, and preventing their dissipation, does not mean that counsel created these asset values. Moreover, the actions for which reimbursement is sought were undertaken in the first instance for the benefit of the applicants; and the applicants have recovered these benefits through the distributions provided in the Plan.

Reimbursement of expenses incurred by participants in reorganizations serves a valid public policy of fostering participation in reorganization proceedings. Participation by interested parties increases the likelihood that the proceedings will not be dominated by a select few, as was the case in many of the equity receiverships which preceded § 77. Reliance by these applicants on cases awarding attorneys fees in antitrust and securities class actions is misplaced. In those cases, there is the much broader public policy of providing an incentive for the private enforcement of Congressional mandates; and the fee awards in such cases also take into account the equitable concept that counsel should share in the fruits of their labors. Bankruptcy reorganization proceedings are primarily for the benefit of the claimants. The common-fund concept and other class-action doctrines have no place in § 77(c)(12) analysis.

The Court's task now is to apply these principles to the pending applications. It is helpful first to review the activities for which reimbursement is sought, and their relationship to the reorganization process; and then to address separately each of the five applications.

## I. REVIEW OF REORGANIZATION ACTIVITIES

The activities in question may, for convenience, be roughly divided into five catego-

ries. The first four relate to specific stages of the reorganization proceeding, and the fifth to the Pennco litigation.

### 1. *June 1970 to December 1973; pursuit of a traditional income-based reorganization of the railroad*

Throughout the entire period from the filing of the bankruptcy petition until the conveyance of the railroad to ConRail on April 1, 1976, the Trustees were faced with the overriding task of continuing to provide rail service, and of making the decisions and solving the problems associated with the day-to-day operation of one of the nation's largest rail carriers. But from the standpoint of reorganization planning, their task during the initial period of reorganization was first to determine what needed to be done in order to make the railroad sufficiently profitable to support a reorganization plan, and then to try to achieve the necessary changes.

It was almost immediately apparent that many of the obstacles to profitability were beyond the control of the Trustees. Nevertheless, it was encumbent upon the Trustees to effect the improvements which were within their control, and they did this to. a remarkable degree. It was also necessary for them to identify the changes which would have to be made by others if the reorganization were to succeed, and to do what they could to urge that corrective measures be taken by others. Support from the public sector for the required changes (involving such matters as regulatory constraints, labor arrangements, elimination of unprofitable freight service, and elimination or subsidization of passenger and commuter services) was, unfortunately, slow in developing. By March of 1973, this Court was compelled to conclude that Penn Central could probably not continue its rail operations after October of that year.

In July of 1973, the Trustees proposed a Plan of Reorganization which would have involved the sale of Penn Central's rail operations to other carriers. The New Haven trustee and the Penn Central Company also proposed plans of reorganization. The ICC held accelerated hearings on these plans, but rejected all of them in September of 1973 because they did not guarantee the continuation of rail service. By this time, Congress was considering various legislative solutions to the problems of Penn Central and the other northeastern railroads in reorganization. On January 2, 1974, the Regional Railroad Reorganization Act of 1973 (RRRA) became law.

During this initial period, the New Haven trustee and the institutional investors and, to a lesser extent, the Penn Central Company, actively participated before the Court. They were, of course, not alone. The indenture trustees were also active, to the extent they regarded as consistent with the fiduciary obligations imposed by their respective indentures. More important adversary roles were played by the Institutional Investors, as holders of a large portion of Penn Central's debt securities, by the New Haven trustee, as holder of a large secured claim and a large potentially secured claim, and by the Penn Central Company as the single shareholder. The efforts of these parties were generally directed to the preservation of the Debtor's assets. Although their efforts did not always meet with success, their views were very important to the integrity of the decision-making process. I will not burden this Opinion with a lengthy catalog of the important issues decided during this period. It suffices to state that major issues concerning the sale of assets, financing of equipment and other capital acquisitions, and reorganization planning, arose on a daily basis during this initial stage of the reorganization.

### 2. *Implementation of the RRRA*

Enactment of the RRRA in January 1974 triggered two related lines of litigation, the hearings and preliminary determinations mandated by the RRRA itself, and challenges to the validity of the statute. Ultimately, the Special Court held that the RRRA provided a "fair and equitable process" for the reorganization of the Penn Central and the other northeast rail carriers in reorganization, and the Supreme Court held (in December 1974) that the RRRA, as

supplemented by the Tucker Act, was constitutional. Once these hurdles were surmounted, there was another round of activity centered on the production by U.S. Railway Association of the Preliminary and Final System Plans, legislative amendment to the RRRA, and the maintenance and financing of rail service pending the conveyance to ConRail on April 1, 1976.

Throughout this period, the New Haven trustee, the Institutional Investors, and Citibank were among the most active participants. Needless to say, important constitutional principles, and very large amounts of money, were at stake. In the end, the rail assets were conveyed to ConRail, and Penn Central and the other northeastern carriers were relegated to the Valuation Case litigation before the Special Court to obtain compensation for the conveyed rail assets.

### 3. Formulation and Approval of the Plan

With the advent of the RRRA and the decision of the Supreme Court upholding its constitutionality, it became apparent that the increasing erosion of the Debtor's estate from its rail operations would come to an end on April 1, 1976. The next task was to devise a plan of reorganization which, while adequately taking into account the uncertainties associated with the RRRA's approach, could be implemented without awaiting the final outcome of the Valuation Case litigation, and without the delays which would be involved in litigating to conclusion all of the myriad other legal issues at hand. With the approval and encouragement of this Court, the Trustees instituted a series of meetings with a large group of interested parties, beginning in late 1975, to explore the possibilities of achieving a consensual plan. Although no firm conclusions were then reached, a smaller group of interested parties, consisting of the New Haven trustee, Citibank, and the Institutional Investors (known as the "Friday Group" because most of its early meetings occurred on that day) emerged as the successor to the original larger group, and continued its exploratory discussions.

Throughout 1976, the Friday Group worked diligently and productively toward the formulation of an acceptable Plan of Reorganization. While it would be an overstatement to suggest that the Plan which was ultimately adopted was the work of the Friday Group, there can be no doubt that the Friday Group played an important and essential role in the planning process. It was necessary to assemble and analyze the vast amount of information available from the Trustees and other sources, having to do with cataloguing the assets which would remain after conveyance and determining their value, and identifying and estimating the amounts of potential claims against the estate; tasks which, with their own staff reduced in the wake of the conveyance to ConRail and occupied with the details of the conveyance and organizing the post-conveyance operation of the estate, the Trustees gladly permitted Citibank to undertake. At the same time, the Friday Group sought to relate the information available to a possible legal framework for a reorganization plan. In July of 1976, the Friday Group published a document entitled "Principles of Reorganization", and shortly thereafter Citibank made available its comprehensive studies of Penn Central's retained assets and claims, its potential cash flows, and its leased lines. The Trustees evaluated these work-products in the light of their own reorganization planning, and concluded that the stated principles might well provide a basis for a consensual plan of reorganization.

While the Trustees proceeded to develop and draft a plan of reorganization, the Friday Group actively sought to "sell" the program to other parties in interest, and worked closely with the Trustees in their efforts. This period of interaction between the Trustees and the Friday Group was marked with some acrimony, but a large measure of cooperation. Eventually, the Trustees filed their proposed Plan of Reorganization on December 17, 1976, and the Friday Group supported it.

A key element in the Trustees' Plan was the proposed compromise by the Govern-

ment of almost all of its claims against the estate, including, most importantly, its mammoth "super-priority" claims under § 211(h) of the RRRA. Members of the Friday Group participated in the discussions between the Trustees and government representatives which led to acceptance of the compromise. Amendments to the Plan were filed in May of 1976, and evidentiary hearings were held in June. Thereafter, further amendments dealing with the treatment of tax claims were filed in November, and were also supported by the Friday Group. This Court ultimately approved the Amended Plan in March 1978.

This brief sketch of the planning process does not convey the full flavor of the tremendous contribution made by the Friday Group. Several of the fundamental premises of the Plan originated in the work of the Friday Group. Its out-of-court efforts in explaining the Plan to other interested parties undoubtedly contributed to its widespread acceptance. The briefs filed by Friday Group members were very helpful to a proper understanding of the legal and factual premises of the Plan. The Friday Group's attention to the details of reorganization documents, its evaluation of the possible impact of appeals, and its analysis of the tax implications of the Plan also provided a valuable contribution to the reorganization process.

As the Plan proceedings moved forward, the Special Court proceedings also accelerated. Members of the Friday Group, as well as the Penn Central Company, actively participated in the Valuation Case litigation before the Special Court.

### 4. Implementation of the Plan

After the Plan was approved, there was a great deal of work having to do with the voting process, the confirmation of the Plan, appeals, the details of the reorganization documents and the Consummation Order, and the negotiation of certain settlements.

### 5. The Pennco Litigation

Through its wholly owned subsidiary, the Pennsylvania Company ("Pennco"), the Debtor owned or controlled a vast assemblage of business entities, for the most part not related to railroading. About a year before bankruptcy, in order to pay off a large amount of short-term debt and to obtain additional financing, the Debtor had pledged all of its Pennco stock, generally regarded as its "crown jewel", to a group of 53 banks, for which Citibank served as agent, as security for a $300 million loan.

Promptly after the bankruptcy petition was filed, Citibank accelerated the loan, which was then in default, and sought to acquire ownership of the Pennco stock. In what was conceived as an interim measure, but actually remained in effect throughout the reorganization, I directed, in Order No. 10, that until further order of this Court, no dividends on the Pennco stock could be declared or paid, and no other fund transfers made to the Debtor by Pennco, except by leave of this Court, after notice to Citibank and an opportunity for hearing.

At that juncture, the situation was as follows: Pennco and most of its constituent enterprises were profitable. However, there were some weak spots, and some management problems; and there was widespread concern that Penn Central's bankruptcy would have an adverse impact upon employee morale and upon future availability of necessary credit. It was essential that the values represented by Pennco not be jeopardized. The Trustees had obtained emergency funding in the amount of $100 million from government-guaranteed trustees certificates, the lien of which took precedence over pre-bankruptcy secured debt. It was clear that large additional amounts of capital would be needed. Availability of additional financing without Government guarantees seemed unlikely, and there could be no assurance that further Government guarantees would be forthcoming. There was room for the argument that the Debtor had no "equity" in the Pennco stock, and that the banks right to foreclose might be established. Finally, there was also room for argument concerning the extent to which it was permissible

to dispose of assets of the Debtor otherwise than pursuant to a plan of reorganization.

Grappling with these problems, the Trustees and Citibank, on behalf of the 53-bank group, commenced negotiations which, in 1972, resulted in a formal settlement proposal. The settlement contemplated that the banks would receive all of the Pennco stock in discharge of the $300 million loan obligation. If Pennco's value increased, the Debtor's estate would share in that increase over a 10-year period, and would receive certain of Pennco's rail assets at no cost. In addition, the banks agreed to provide $150 million in additional equipment financing.

The settlement proposal triggered two related lines of litigation, one concerning the merits of the settlement proposal itself, and the other concerning a challenge to the validity of the initial pledge of the Pennco stock. The principal opponents of the settlement agreement were the Institutional Investors, the New Haven trustee, a group of Penn Central shareholders ("the Robinson petitioners") and, ultimately, the United States Government. The challenge to the pledge itself was led by the Robinson petitioners and by special representatives appointed by this Court to represent the interests of bondholders whose indenture trustees were members of the 53-bank group.

After extensive litigation, this Court rejected the settlement proposal, not because it was legally impermissible or disadvantageous to the Debtor's estate, but on the ground that its advantages were not so pronounced as to justify authorizing its implementation despite the objections of so many interested parties, particularly the United States Government. Rejection of the settlement proposal removed the immediate necessity of adjudicating the validity of the pledge itself, and the parties tacitly agreed that those issues should remain unresolved. These remaining disputes were eventually compromised and resolved in the Plan of Reorganization.

In making the determination as to whether any or all of these litigation activities benefitted the Debtor's estate and its reorganization, it is of crucial importance to bear in mind the chronological context. When the settlement was negotiated and put forward, the RRRA (or, indeed, any other possible Congressional solution to the rail crisis) was far in the future. The Trustees and other interested parties were struggling with the task of reorganizing a railroad, and with carrying out their responsibilities to the public. With the benefit of hindsight, it is easy to conclude that the parties who opposed the settlement, and sought to retain Pennco as part of the Debtor's estate, were engaged in activities beneficial to the estate, since Pennco formed the nucleus around which the reorganization has been successfully accomplished. Perhaps not so readily discernible, but equally true, is the fact that, in the light of what was then knowable, the proposed settlement would also have been beneficial to the estate. The parties supporting the proposed settlement were also performing services beneficial to the estate and the reorganization process. It is true, of course, that one of the events which triggered the negotiations leading to the proposed settlement was the effort by the banks to foreclose the pledge, and to advance their own interests at the expense of the Debtor's estate. The costs of such efforts are not reimbursable under § (c)(12). But this does not substantially undermine the conclusion that the efforts of Citibank and others in negotiating, proposing, and supporting the proposed settlement were of benefit to the estate, and are reimbursable.

A somewhat similar analysis is appropriate with respect to the litigation challenging the validity of the pledge itself. Citibank is not entitled to be reimbursed for its expenditures in defending its status as a secured creditor, but is entitled to recognition to the extent its efforts contributed to the formulation and approval of a consensual Plan of Reorganization. These distinctions are difficult to quantify with precision but can, I believe, be adequately covered by adjustments to the awards in particular cases.

## II. REVIEW OF INDIVIDUAL APPLICATIONS

### 1. *Institutional Investors*

Early in the reorganization proceeding, some 13 insurance companies holding more than $400 million of pre-petition debt obligations of Penn Central banded together in an informal organization known as "Institutional Investors, Penn Central Group". By 1976, the membership had declined to five insurance companies, but these five permanent members of the group owned in excess of $300 million of Penn Central's debt.

The Institutional Investors played an active role throughout the entire proceeding, and were key litigants in many significant matters in this and other courts. Of particular note in the early phases of the reorganization were the Institutional Investors' activities concerning sales of major assets, the Trustees' reports on reorganization planning, the use of escrowed funds, and the Plan proceedings before the ICC. Later, the group was particularly active throughout the RRRA litigation and its aftermath. The Institutional Investors were a member of the Friday Group, and played an active and productive role in the approval and consummation of the Plan.

Wilkie, Farr & Gallagher of New York City (and particularly Walter Brown, Esq., of that firm), served as lead counsel for the Institutional Investors, which paid it a total of $2,522,100 for its legal services. Ballard, Spahr, Andrews & Ingersoll, of Philadelphia, served as local counsel for the Institutional Investors, and received $120,987.49 for its services. The hourly rates used in calculating these fees are reasonable, and the full fees will be allowed to the Group.

Expenses of counsel for the period totaled $354,399.80. These expenses will also be allowed. In addition, the Group paid $565,-799.31 to its transportation consultant, Wyer, Dick & Company. These services were plainly necessary. Throughout the pre-conveyance period, the configuration of the Debtor's rail system was a matter of frequent discussion. The Trustees' reports on reorganization planning, and the various abandonment proposals, created significant analytical tasks for the transportation consultant, as did the Preliminary and Final System Plans of USRA. And it was also necessary and appropriate for the Institutional Investors to utilize Wyer, Dick's services in connection with preparing its Valuation Case analyses. These expenses, together with certain additional expenses including the Group's share of the cost of printing the "Principles of Reorganization," will be allowed.

Thus, the award to the Institutional Investors, Penn Central Group, includes counsel fees of $2,643,087.49, expenses of counsel, $354,399.80, and other expenses of $684,533.05, for a total award of $3,682,-020.34 (base award, exclusive of delay increment).

### 2. *Citibank*

As noted above, Citibank participated actively in these proceedings, principally as agent and spokesman for the group of 53 banks which were owed $300 million plus interest, secured by the pledge of the Pennco stock. Citibank seeks an allowance totaling $5,598,490.77, calculated as follows: counsel fees, $3,340,429; expenses of counsel, $213,012.09; personnel expenses, $1,198,341; and other expenses, $846,708.68.

There can be no doubt that most of the activities which generated these expenses were beneficial to the estate. In addition to its general activities in the hearings which addressed various important reorganization issues, Citibank was particularly active and helpful in analyzing the Debtor's overall financial and operating positions, and in developing significant studies concerning future prospects and financial requirements. Following enactment of the RRRA, these activities intensified. Citibank's work with the Friday Group in producing the "Principles of Reorganization," and its debt and claims analysis, its analysis of the leased line problems, and its three-volume cash-flow forecast made especially valuable contributions to the achievement of the consensual plan.

It remains necessary, however, to review the reasonableness of the costs incurred, and also to consider whether certain adjustments should be made to reflect disallowance of reimbursement for expenses incurred solely in pursuit of Citibank's own interests.

### A. Counsel Fees and Expenses of Counsel.

The Philadelphia firm of Fox, Rothschild, O'Brien & Frankel served as local counsel for Citibank, insofar as efficiency and economy could be served by the arrangement. The firm was paid fees aggregating $118,315. This reflects hourly rates slightly in excess of the special counsel rate, but in view of the limited and special nature of the undertaking and the general economies achieved, the entire fee appears reasonable, and will be allowed.

Citibank also paid the New York law firm of Zalkin & Cohn $36,000 for legal services rendered early in the proceeding. This payment, also, will be allowed, as will the expenses of both firms.

The New York firm of Sherman & Sterling served as Citibank's counsel throughout the proceedings. Their fees totaled $3,186,114 ($1,234,250 through March of 1976, and $1,951,864 for the remaining period of the application).

The record reflects the total hours billed for partners, associates, and summer associates and paralegals during each of these two periods, but does not reflect the hourly rates. The affidavit of the partner in charge takes the position that the firm's fees are calculated on the basis of complex formulae and cost measurement indices which would not be "understandable" to outsiders.

There is, of course, no doubt that the quality of the firm's work was of the very highest; and much of its work was performed under difficult time-constraints. And it is appropriate to permit some further upward adjustment to reflect higher overhead costs in New York than elsewhere.

For the initial period, from 1970 through March 1976, it appears that the firm's billing rates were only moderately in excess of the special counsel rates (approximately 18.7% higher). In the circumstances, this differential is not unreasonable.

For the later period, however, the differential is much greater, amounting to about 69%. During this period, the firm billed for a total of 17,771.9 hours (partners, 5,446.8 hours; associates, 8,903.9 hours; and summer associates and paralegals, 3,392.2 hours). This works out to an overall average hourly rate of $109 per hour. The same total amount would be achieved, for example, by a schedule of $200 per hour for partners, $85 for associates, and $30 for summer clerks and paralegals; or $175 per hour for partners, $100 for associates, and $30 for summer clerks and paralegals. Under any view of the matter, it seems clear that the hourly rates charged substantially exceed those allowed to any other applicants for compensation in this case (including all of the firms which served as counsel to indenture trustees). Giving full weight to the exemplary quality of the services performed, the difficulty of the issues, the magnitude of the responsibility, and all other pertinent factors, I find myself unable to justify disparities of this magnitude. I have concluded that, for purposes of calculating the ultimate reasonable allowance to Citibank, the maximum which can be attributed to Sherman & Sterling's counsel fees for the entire period is $2,884,250 plus expenses. It should be noted that even this figure represents an upward adjustment of about 31% above the special counsel rates.

Because Sherman & Sterling's billings covered the firm's services attributable solely to defense of Citibank's secured position and attempts to recover its collateral, the entire amount is not allowable. The application is not sufficiently detailed to permit calculation of the adjustment with mathematical accuracy. All of the non-reimbursable services occurred in the 1970–1976 period, for which $1,234,250 is viewed as appropriate compensation. It appears probable that approximately 50% of the firm's work during this period related to

Pennco matters; and I believe it appropriate to assume that approximately 25% of the firm's Pennco efforts should be disallowed, because unrelated to the interests of the Debtor's estate. Thus, I have concluded that 12½% of the total claimed for the initial period should be disallowed.

### B. Personnel Expenses

Citibank seeks reimbursement in the total sum of $1,198,341 for the services of Citibank officers and employees. Of that amount, $272,162 was billed by Citibank's corporate finance department for time charges for the July 1976 cash-flow forecast. As noted above, this was a cooperative effort endorsed by the Trustees. The full amount of that expense will be reimbursed. Citibank also expended $182,000 for consulting services for three studies of ConRail, $48,743 for computer services, and $11,421 for a consulting economist. These items, aggregating $242,165 will also be allowed.

The balance of the personnel expenses, $683,514, cover the salaries of bank personnel for time devoted exclusively to Penn Central matters. I am not persuaded that the full amount of this expense is properly reimbursable under § (c)(12). In the first place, a substantial portion of this expense surely represents the ordinary cost of running a bank, rather than additional expense incurred by reason of the reorganization proceeding. Ordinarily, the overhead expenses of a lending institution are subsumed in the interest charged. In the second place, some portion of these services undoubtedly related to the defense of the Pennco pledge and the attempts to seize the collateral, and are thus not allowable. Finally, it is reasonable to suppose that much of this activity related to internal communications among the 53-bank group, a process which benefitted the Debtor's estate only marginally, if at all. Taking all of these factors into consideration, I have concluded that only 50% of this $683,514 item should be allowed.

Thus, the base amount of the allowance for Citibank's internal expenses is fixed at $856,084.

### C. Miscellaneous Expenses

Citibank also seeks reimbursement of approximately $846,700 for miscellaneous expenses. Of this amount, roughly $266,000 represents travel, telephone, reproduction costs, subscription services and the like; and approximately $580,200 represents amounts billed by outside firms and paid by Citibank for printing expenses and transcript fees. Some portion of these expenses should be allocated to ordinary overhead, interbank communications, and non-reimbursable aspects of the Pennco litigation. In addition, there is reason to doubt that all of the printing expenses are properly chargeable to the Debtor's estate under § (c)(12) (for example, the $277,099.84 for printing what appear to have been an unnecessarily large number of copies of Citibank's June 10, 1974 brief and the financial analyses of USRA's Preliminary and Final System Plans). Given these problems I have concluded that an allowance of 50% of these miscellaneous expenses, or $423,350, is appropriate.

### 3. The New Haven Trustee

The New York, New Haven & Hartford Railroad Company had been in bankruptcy reorganization since July 1961. Its fortunes continued to decline, and it became apparent that the New Haven could no longer survive as an independent railroad. When the Pennsylvania Railroad and the New York Central sought the approval of the ICC for a merger of those two railroads, the New Haven sought and obtained an ICC order making acquisition of the New Haven a condition of its approval of the Pennsylvania-New York Central merger. The merged company, Penn Central Transportation Company, was required to assume ownership and operation of the New Haven properties in 1968; the price to be paid for the properties remained to be determined. An agreement was reached, under which the New Haven would be paid principally in the form of Penn Central common stock, but there was an underwriting provision pursuant to which Penn Central guaranteed the value of the stock at $87.50 per share.

The decision of the United States Supreme Court finally approving this arrangement was rendered shortly after Penn Central filed its § 77 petition. Because of that development, the Supreme Court remanded the case for reconsideration of "the form that Penn Central's consideration to New Haven should properly take, and the status of the New Haven estate as a shareholder or creditor of Penn Central". *New Haven Inclusion Cases*, 399 U.S. 392, 489, 90 S.Ct. 2054, 2108, 26 L.Ed.2d 691 (1970).

There was further litigation before the New Haven reorganization court and in this Court. The upshot was a decision by this Court that the New Haven estate should be tentatively treated as holding a lien to secure the purchase price of its property, and that final determination of its status should await the development and approval of a plan of reorganization of the Penn Central. In addition to this potentially secured claim arising under the guarantee agreement, the New Haven trustee also held some $34 million in Penn Central bonds, secured by property previously owned by the New Haven.

Thus, the New Haven trustee, on behalf of the parties in interest in the New Haven reorganization proceeding, had a very substantial stake in the outcome of the Penn Central reorganization. Moreover, the New Haven bondholders and other creditors had already been awaiting payment of their claims for more than 10 years. It is therefore quite understandable that the prospect of patiently awaiting the outcome of still another railroad reorganization proceeding was not an attractive one. As might be expected, therefore, up until the time that the RRRA-solution became inevitable, the position of the New Haven trustee was adverse to that of the Penn Central Trustees on a wide range of issues. The New Haven trustee opposed the issuance of trustees certificates, opposed most of the sales of assets, and opposed rail-related capital expenditures. This was not mere obstructionism, however, but a valid campaign for the preservation of the Debtor's estate from the ravages of rail-related erosion, so that an acceptable reorganization could be achieved.

Given the actual outcome—a consensual plan under which all creditors received adequate satisfaction of their claims—I have no hesitation in concluding that the New Haven Trustee has met the initial burden of showing that his efforts were of benefit to the estate. Indeed, after the RRRA was in place, the efforts of New Haven's counsel, in the Friday Group activities, the development and formulation of the Reorganization Plan, and in the Valuation Case litigation, were of inestimable benefit to the estate and the reorganization process. Moreover, even in the earlier, more adversarial stage, the New Haven interests occupied a position akin to that of a "loyal opposition", and proved helpful to the Trustees and to this Court in many ways too numerous to mention. Counsel for the New Haven trustee brought a high level of factual and legal analysis to the litigated issues; this high quality of advocacy was of very great benefit to the Court in analyzing and deciding the complicated and difficult issues presented throughout the reorganization proceeding. I fully endorse the comments of the Securities & Exchange Commission, singling out the New Haven trustee and his counsel for their positive contributions throughout the case.

Thus, it is clear that the costs and expenses, including counsel fees, incurred by the New Haven trustee, are reimbursable; and it is also clear that, in determining the appropriate level of compensation of counsel, a substantial increment because of the extent of the benefit conferred is appropriate. Unfortunately, however, I find myself unable to justify increments of the same order of magnitude as contemplated by the present application.

In addition to certain out-of-pocket expenses which are unexceptionable and will be allowed, the New Haven trustee seeks an allowance of $10 million to cover counsel fees of the law firm of Sullivan & Worcester, of Boston, Massachusetts. Of that amount, the trustee has already paid $1,750,711.50 to the firm, as authorized by the New Haven reorganization court, for

services related to the Penn Central reorganization. The trustee seeks reimbursement of that sum, and a direction that the balance of the $10 million applied for be paid directly to the Sullivan & Worcester firm.

The record establishes that Sullivan & Worcester devoted some 27,314 hours to Penn Central reorganization matters (partners, 17,329 hours, associates 9,109 hours, clerks and paralegals, 876 hours). At the firm's normal guideline rates in effect in July 1978, the total fee, purely on a time basis, would be $2,247,395. Application of the special counsel rates would yield a substantially similar fee.

In support of the $10 million request, it is asserted that the efforts of the firm produced benefits for the estate in the range of $875 million to $1,050,000,000. Hence, the fee sought is only about 1% of the benefit, and therefore relatively modest. There are several reasons for rejecting this approach. Counsel for the New Haven trustee played a very significant part in the cooperative effort which may have produced benefits of the level suggested, but cannot properly claim exclusive credit. Moreover, and more importantly, the suggested standard is not, and never has been, an acceptable basis for determining reasonableness for purposes of § (c)(12) allowances.

The unique contributions of the Sullivan & Worcester firm, and particularly of Joseph Auerbach, Esq., of that firm, merit compensation at levels reflecting a significant increment above normal hourly rates. I am satisfied that an allowance at the upper end of the range of reasonableness is appropriate in this instance. Considering all of the relevant factors, I have concluded that the proper allowance to the New Haven trustee for counsel fees of the Sullivan & Worcester firm is $3,750,000 (base award, exclusive of delay factor).

### 4. Penn Central Company

David Berger, P.A. represented the Penn Central Company, which owned all of the Debtor's common stock, throughout these proceedings. Penn Central Company had few assets other than its stock interest in the Debtor, but had significant debt obligations it was unable to meet. Contemporaneously with the Debtor's reorganization proceeding, Penn Central Company went through a Chapter XI arrangement proceeding, presided over by Bankruptcy Judge Goldhaber.

The company has paid the Berger firm $270,000 on account of its bill for legal services, with the understanding that the law firm would seek an allowance covering its full claim in this proceeding. An order of bankruptcy Judge Goldhaber provides that whatever allowance is approved by this Court will be divided between the Berger firm and the company 50–50, until the company has recovered the $270,000 previously paid.

On behalf of the company, the Berger firm participated in many of the important proceedings in this and other courts, including the Pennco settlement litigation, the ICC Plan hearings, the constitutional attacks on and the statutory proceedings under the RRRA, Penn Central Company's severance petition, and disputes related to the sale of the Barclay Hotel, the Debtor's Madison Square Garden stock, and the Westside Yards in New York. The firm was also active in the pre-conveyance discussions concerning reorganization planning, but was not actively involved in the formulation of the Plan of Reorganization. For the most part, these activities, and many others which have not been mentioned here, were of benefit to the Debtor's estate, and there is no reason for imposing any discount because of duplication of effort.

Penn Central Company was granted limited intervention in the Valuation Case before the Special Court, and submitted briefs on the issues it was permitted to address. These actions, too, may be regarded as beneficial to the estate. Somewhat surprisingly, the Berger firm also accepted an appointment to the Liaison Committee appointed by the Special Court, notwithstanding the limited nature of its intervention in that proceeding. The record does not permit a precise determination as to the time

spent on Liaison Committee work, although it seems clear that many hundreds of hours were devoted to this effort. It must be stated that the benefit to the Debtor's estate from the Berger firm's participation in the Liaison Committee would seem to have been marginal at best.

From the beginning of the reorganization until April 1, 1976, the Berger firm devoted some 5,329.5 hours on Penn Central reorganization matters and an additional 2,266 hours from March 1976 through May 1978, making a total of 7,595.5 hours. The standard billing rates of the firm as of December 1976 and July 1978 have been provided, but these rates clearly do not necessarily correspond to all of the periods in which the work was performed. Application of the special counsel rates would produce an aggregate fee of $505,123. On the other hand, applying the Berger firm's December 1976 rates to the entire period would suggest a fee totaling $788,843.75. The difference is due largely to the $200 per-hour rate claimed for the senior partner, David Berger, Esq., who recorded approximately 27% of all of the hours recorded for the firm.

There are valid reasons for approving an award in excess of the special counsel rate. Penn Central Company participated in only a limited number of matters, all of which were important. The firm represented its client's interest well, and made a significant contribution to these proceedings. Quite properly, counsel have focused in particular on the West Side Rail Yard transactions and the Barclay Hotel as examples of their success. On occasion, the firm stumbled slightly, as when it persuaded this Court that the price initially offered for the Madison Square Garden stock was inadequate (it continued to decline, and was later disposed of at a lower price); but the efforts were undoubtedly intended to benefit the Debtor's estate, and the positions asserted were valid in light of the available information. A further factor worthy of consideration is the contingent nature of the firm's compensation. Because of the straitened circumstances of Penn Central Company, the Berger firm carried the torch for the stockholders with no assurance that the firm would

ever be paid. Finally, and most importantly, the quality of the firm's legal work was exceptionally high, and much of the work was done under serious time-constraints.

Recognizing that the amount requested represents a very substantial multiple over the reasonable hourly rate, the applicant asserts that the firm's efforts produced benefits for the estate in excess of $30 million. Although this claim has somewhat more plausibility than similar claims made on behalf of the Robinson petitioners, as will be discussed below, I again must reject the contention. Asset values were not created by the law firms involved, and their preservation and enhancement was the product of many factors. Moreover, I remain persuaded that allowances under § (c)(12) cannot be directly related to asset values.

On the other hand, I am satisfied that the benefits to the estate to which the Berger firm contributed should be taken into account to some extent, and that this factor justifies an increase above the special counsel rate. All in all, I believe the appropriate allowance is $700,000, together with the firm's expenses of $49,430.23, plus reimbursement to the Penn Central Company for the $26,307 in expenses previously paid (base award, exclusive of delay increment). The distribution is to be allocated in accordance with the order previously entered by Bankruptcy Judge Goldhaber.

### 5. The Robinson Petitioners

Four law firms and a single practitioner combined to represent the petitioning shareholders of Penn Central Company in the "Robinson Petition" litigation. Lead counsel was the firm of David Berger, P.A. The present petition for an allowance under § (c)(12) is submitted by the attorneys themselves, rather than their clients. It seems to have been understood that counsel's compensation would be limited entirely to such award as this Court might approve pursuant to § (c)(12). Since the object of the Robinson Petition litigation was to invalidate the Pennco pledge and to block the proposed Pennco settlement, there was nev-

er any prospect of a direct monetary recovery by the clients themselves, hence this fee arrangement is understandable.

The principal activities related to the investigation and litigation of the Robinson Petition took place between March 1972 and December 1972, although some additional time was spent in 1973 and 1974. The record reflects a total of 5,006 hours devoted to this effort (3,727 by partners, 1236.5 by associates, and 342.75 by law clerks and paralegals). When the Trustees filed their proposed Reorganization Plan in December 1976, counsel embarked upon a second round of activity, and interposed objections to the proposed treatment of the claims of the bank group in the Plan. After actively participating in the Plan hearings, counsel withdrew the objections. The present application reflects an additional, 2,066.75 hours in connection with the Plan proceedings (1336.25 hours for partners, 637 hours for associates, and 93.5 hours for law clerks and paralegals).

For all of these efforts, the applicants seek an award of $6 million. This would represent an average hourly rate of $813.81. By contrast, if the 1978-level special counsel rates were applied to the hours recorded, the total fee would be $588,403. Even applying the Berger firm's 1976 rates to the Robinson Petition litigation, and its 1978 rates to the Plan proceedings, the total fee would be approximately $967,765. Thus, the claim seeks an award 6.2 times the firm's (somewhat later) hourly rates, and more than 10 times the special counsel rates. Allowances based on multiples of this magnitude are simply unheard of, and totally unwarranted, in reorganization proceedings.

In justification of the fee requested, the applicants assert that their efforts preserved for the estate the entire value of Pennco, which they fix at between $500 and $600 million, together with all of Pennco's earnings from 1972 to 1977, and the alleged value of all of the concessions made by the banks as part of the consensual Plan of Reorganization. It is asserted that the total of these benefits is approximately $980 million, to which should be added the benefit of preserving the utility of the Debtor's tax loss carryforwards, as well as other benefits. Since the grand total of all of these benefits is in excess of $1 billion, the claimed fee of $6 million is only 6/10 of 1% of the benefits conferred, and is therefore reasonable.

In making these arguments, counsel exhibit the tenacity, aggressiveness, courage and imagination which characterized their efforts throughout the reorganization proceeding. While these attributes of advocacy, in the performance of services for which allowance will be made, justify a substantial increase over the normal special counsel rate, in the present context they are no substitute for rational argument.

The original proposal to settle the Pennco matter with the bank group was, as mentioned above, a mixture of plusses and minuses. Given the actual course of the reorganization, after enactment of the RRRA, there can be no doubt that the estate benefitted from disapproval of the proposed settlement. But rejection of the settlement did not determine the course of the reorganization, and it is not difficult to envision other scenarios in which rejection of the settlement would, with the benefit of hindsight, be viewed less favorably. More importantly, it is obvious that the principal factor in rejection of the settlement was the Government's objection to it, a circumstance for which the Robinson petitioners and their counsel can scarcely claim credit.

The applicants deserve substantial credit for their imaginative and thorough challenge to the validity of the pledge. Although this does not, as the applicants apparently believe, readily translate into a totally successful assertion of their position (the issue was never finally decided by the Court; but as stated in this Court's Opinion approving the Plan, "The most likely outcome of the litigation would have been some form of modified treatment in the Plan of Reorganization"), the applicants did make a valuable contribution to the compromise of these issues in the Plan of Reorganization.

After the Pennco settlement proposal was rejected by the Court, the banks did file a petition to foreclose the pledge. The Robinson petitioners opposed this application, but so did the United States Government and the Penn Central Trustees. The foreclosure application was not made until October 1973, when enactment of the RRRA was imminent (the RRRA became law in January 1974). No one can seriously suggest that "but for" the opposition filed by the Robinson petitioners, the banks would have been permitted to foreclose. A considerable measure of posturing and saber-rattling was being indulged in; it is fair to state that, in view of the RRRA, no one took the foreclosure petition very seriously. It was obvious to all concerned that Pennco would be retained as the nucleus of the reorganized company.

The fact that I regard the amount requested by these applicants to be grossly excessive, and am not persuaded to the contrary by the justifications asserted, should not be permitted to detract from the genuine merit of the application. Counsel for the Robinson petitioners, and particularly the Berger firm, provided very high-quality legal service, and their activities were of decided benefit to the Debtor's estate. A substantial increment above normal hourly rates is appropriate. In my judgment, a fair and reasonable allowance for all of the services of counsel for the Robinson petitioners is $1,150,000, together with the $34,698.89 in expenses claimed (base award, exclusive of delay increment).

### 6. *The Delay Factor*

The Orders granting the various allowances will include an increment designated as "delay factor". This addition to the allowances is comparable to that awarded previously to the Indenture Trustees. Funds to satisfy § 77(c)(12) applications were set aside pursuant to the Consummation Order. The delay factor is an equitable allocation of the earnings on the funds to the persons for whose benefit the funds were set aside.

### III. SUMMARY

The following chart summarizes the Court's decisions on the pending applications:

| APPLICANT | CLAIMED | ALLOWED | DELAY FACTOR | TOTAL AWARD |
|---|---|---|---|---|
| Institutional Investors | $ 3,682,020 | $ 3,682,020 | $ 1,288,707 | $ 4,970,723 |
| Citibank | 5,598,490 | 4,376,730 | 1,531,855 | 5,908,585 |
| New Haven Trustee | 10,399,295 | 4,149,245 | 1,452,235 | 5,601,480 |
| Penn Central Company | 1,248,328 | 775,737 | 271,508 | 1,047,245 |
| Robinson Petitioners | 6,034,698 | 1,184,698 | 414,644 | 1,599,342 |
| | $26,962,831 | $14,168,430 | $4,859,949 | $19,127,375 |

### IV. POSTSCRIPT

The fees and allowances now being approved for these five applicants aggregate nearly $20 million. Substantial additional amounts have previously been approved for others involved in the litigation. While these amounts, in the abstract, may seem very large, the allowances cover many years of intensive activity. I am satisfied that the amounts authorized are entirely reasonable. Perhaps more importantly, I am absolutely convinced that, but for the dedication, skill, legal ability, and remarkable cooperation of the counsel involved, litigation expenses would have been multiplied many times over. Whatever the historical assess-

**514**

ment of the Penn Central reorganization may prove to be, there can be no doubt that the performance of the lawyers involved will never be excelled.