In re The **WHITE MOTOR CREDIT COR-PORATION**, White Motor Corporation, Gemini Manufacturing Co., Debtors.

**Bankruptcy Nos. B80–3360 to B80–3362.**

United States Bankruptcy Court,
N.D. Ohio, E.D.

June 24, 1985.

## MEMORANDUM AND ORDER

WILLIAM J. O'NEILL, Bankruptcy Judge.

On September 4, 1980, White Motor Corporation and its wholly-owned subsidiaries, White Farm Equipment Company, The White Motor Credit Corporation, Gemini Manufacturing Co., White Motor Corporation of Canada Limited and The White Motor Credit Corporation of Canada Limited, filed voluntary petitions under Chapter 11 of the Bankruptcy Code.

White Motor Corporation (WMC), formerly one of the world's leading manufacturers of heavy duty trucks and farm equipment, is one of the largest Chapter 11 reorganizations ever filed. In the last fiscal year prior to commencement of these proceedings, WMC and affiliates operated internationally, had consolidated sales of 1.2 billion dollars and employed approximately 10,000 hourly and salaried workers. More than 40,000 entities asserted claims or interests in this vast reorganization.

The administration of this industrial giant presented innumerable diverse, complex business and legal issues requiring expert services of scores of professionals from the highest echelon in their respective specialized fields. Currently at issue are final applications of the professionals for allowance of compensation and reimbursement of expenses in WMC, Gemini Manufacturing Co. (Gemini) and The White Motor Credit Corporation (WMCC). These 48 applicants request in excess of 24 million dollars. Due to adjustments and amendments made at the evidentiary hearings, however, the figures requested herein may differ from those appearing in the written applications.

The deadline for filing final applications was January 17, 1984. By order dated November 21, 1984, supplemental applications were to be filed by December 7, 1984 and any objections thereto by January 11, 1985. The Disposition Assets Trustee (DAT), as successor to WMC, filed a summary and statement of position on all applications. Objections were filed to some of the interim fee applications by the Securities and Exchange Commission (SEC), the Bank Creditors and the Official Creditors' Committees of WMC and WMCC. The Pension Benefit Guaranty Corporation (PBGC) also filed an objection which was subsequently withdrawn.

By prior orders, interim fee applications of professionals employed under Sections 327, 1103 and 1104 of the Bankruptcy Code were paid 70% of the requested fees subject to the final evidentiary hearings on January 22nd through the 31st, 1985. By order of March 27, 1984, 85% of interim compensation requests was paid to Levin and Weintraub and Crames; Squire, Sanders and Dempsey and Hahn, Loeser, Freedheim, Dean and Wellman. Pursuant to the May 28, 1981 order, all professionals were paid 100% of their expenses on a monthly basis.

### HISTORY

WMC was incorporated in Ohio in 1915 as successor to the business of White Com-

pany organized in 1905. At commencement of these proceedings, WMC was principally engaged in the manufacture and sale of heavy duty trucks and farm equipment. Review of the entire history is unnecessary except to state that serious financial difficulties encountered in the 1970's, intensified in 1979 and 1980 and ultimately precipitated filing of the reorganization proceedings. Reference to some of the salient events, issues and outstanding accomplishments, however, which produced the highly successful results in reorganization is important and, indeed, one of the vital concerns in determining allowance of reasonable compensation.

One of the primary interests of WMC in these proceedings was disposing of various corporate businesses and assets. In the relatively short span of three years under extremely difficult circumstances, WMC was substantially liquidated to the ultimate benefit of all creditors. Major dispositions included the sale of White Farm Equipment Company (WFE) to White Farm U.S.A., Inc., a subsidiary of TIC Investment Corporation. This sale avoided 250 million dollars in claims that would have forced liquidation of the farm business. The WMC truck transaction with A.B. Volvo's subsidiary, Volvo White Truck Corporation, for approximately 70 million dollars was monumental. Disposition of the Canadian farm and truck businesses and sale of WMC stock were invaluable and highly productive. To the benefit of creditors, sales of subsidiaries and real estate holdings were also effected. All sales were negotiated at terms most favorable to the debtor thereby relieving the estate of sizeable liability. Further, a number of these transactions served as precedent under the then relatively new Bankruptcy Code. For example, sale of the truck business to A.B. Volvo of substantially all the operating assets without benefit of a formal disclosure statement and plan was a landmark decision.

Although the following data will subsequently be discussed, a recap at this juncture will serve to emphasize the import of these sales. The reorganization proceedings involved 7 major corporate dispositions, 5 of which were accomplished within the first year of the filing. These transactions were effected during a period of deep depression in the heavy truck and farm machinery businesses. They were accomplished under rigid time schedules which required extraordinary effort to satisfy unreasonable deadlines. The transactions still produced recoveries far in excess of estimated liquidation values. These valiant efforts accounted for thousands of claimants receiving substantial distributions. Gemini creditors were paid 70% of allowed claims, those in WMCC received consideration equal to 100% while White Motor Canada creditors were paid 85%. In WMC in excess of 125 million dollars (47.4%) has been distributed to date with an additional 5% contemplated. Considering the 10% to 20% initial projections by some creditors, these results are indeed spectacular.

Another area of considerable importance was resolution of outstanding product liability claims. WMC was named defendant in numerous lawsuits alleging damages caused by defects in products manufactured or distributed. A Special Master was appointed to assist in disposing of these claims totaling hundreds of millions of dollars. A product liability claim program was developed and implemented, and though ultimately nullified it was, nonetheless, innovative and provided a mechanism for the successful settlement of a vast number of claims.

Employee related claims also posed an enormous problem of considerable significance. When the petition was filed, WMC employed a work force of thousands of union and salaried personnel. In addition, there were thousands of retired employees entitled to benefits. Sale of the truck operations and closing the East 79th Street facility in Cleveland resulted in rejection of collective bargaining agreements and additional employee claims.

Retiree claims raised myriad legal, actuarial and practical problems which impeded their resolution. Benefits were maintained for retirees after the filing date while at-

tempts were made to quantify the extent and priority of retiree claims for health and related benefits. These claims were negotiated and ultimately settled under Class 6 of the plan which provided an innovative, responsive treatment of claims inadequately dealt with by a cash payment. The claims were treated as an aggregate allowed claim of 60 million dollars on which payment was made to a Retiree Trust to provide continuing benefits to claimants.

Employee Severance and Vacation pay claims in excess of 800 were also in issue. Their priority status was in dispute in the U.S. Circuit Courts. The bulk of these claims was eventually compromised, however, several employees opted out of the settlement which required briefs, arguments and ultimate Court resolution.

Pension claims presented countless practical and legal issues. The PBGC filed 17 claims in excess of 67 million dollars relating to pension funding and guaranty letters. In addition United Auto Workers (UAW) submitted a 4 million dollar claim for benefits not guaranteed by the PBGC. The PBGC claims served as the basis for a motion for withdrawal of reference under the Bankruptcy Amendments and Federal Judgeship Act of 1984 resulting in one of the initial judicial interpretations under that Act. PBGC claims also required extensive and costly discovery, pleadings, briefs, meetings, negotiations and trials. Through the arduous efforts and legal genius of counsel, these claims were ultimately resolved to the benefit of creditors and the estate.

Approximately 45,000 claims totaling one and a half billion dollars were filed in WMC, WMCC and Gemini cases. A sizeable number required protracted negotiation and litigation. Countless adversary proceedings, hearings and trials were attendant to this reorganization.

The WMC plan was confirmed on November 18, 1983 slightly in excess of three years after the case was filed. Considering the magnitude and complexity of this gigantic undertaking, the demanding activity and results achieved, confirmation with-

in that time frame by any standard is an extraordinary accomplishment. While WMC was substantially liquidated, the debtor has reorganized and is operating as Northeast Ohio Axle, Inc. The plan provides for payment to general unsecured creditors in cash and stock. As previously indicated, cash payments will exceed $.50 on the dollar and common stock was recently selling for $8.00 per share, a startling contrast to the early projections of $.10 to $.20 payment on the dollar. Holders of outstanding stock and equity interests in WMC retained a one-tenth share for each share held in the reorganized debtor. Claims based on subordinated debentures received a $2,400,000 distribution in settlement thereof. As mentioned, claims based on retiree health benefits were resolved by payment of a 60 million dollar claim to the Retiree Trust. Early plan confirmation was also accomplished by the decision of the debtor and counsel to pursue a course of action other than suggested in the Examiner's report. The Examiner cited several potential causes of action against institutional creditors plus the possible recovery of sizeable preferences. Pursuit of these actions, though perhaps meritorious, would have required significant time, expense and massive litigation which may have jeopardized the prospect of a consensual plan.

WMCC, a wholly-owned subsidiary of WMC with a net worth exceeding 100 million dollars, provided retail and wholesale financing of trucks and farm equipment manufactured by WMC or accepted by its dealers as trade-ins. The WMCC plan was confirmed on December 21, 1981 just fifteen months after the petition was filed. Confirmation was preceded by lengthy, intensive negotiations. Significant areas of activity included (1) effecting an operating agreement with WMC and amendments thereto which stabilized the relationship between the two entities, (2) distributing interim payment of 15 million dollars to creditors which was novel and unprecedented under the new Code, and (3) resolving the controversial issue of substantive consolidation which would have destroyed the in-

tegrity of the WMCC estate. As stated above, the extremely complex WMCC plan provided 100% payment to unsecured creditors and future sale of WMCC to a third party.

WMCC obligations to Court retained professionals and institutional lenders were assumed by WMC pursuant to agreement with Clark Credit Corporation who purchased WMC's interest in WMCC.

Gemini, another wholly-owned subsidiary of WMC, was principally involved in production and marketing of trucks and tractor-cabs, the majority of which were sold to WMC. As stated, the Gemini plan confirmed on November 10, 1982 provided 70% payment of general unsecured claims. Confirmation was preceded by vigorous attempts to substantively consolidate the case with that of WMC. All payments under the Gemini plan were made from funds or property provided the debtor by WMC who is also liable for payment to Court-retained professionals.

### OBJECTIONS

Various objections were filed to interim and final applications for compensation. The SEC filed six objections to interim allowances which are basically instructive; i.e., requesting the Court to require detail and documentation and to avoid compensating duplicated efforts. On November 10, 1981 the Bank creditors objected to the Special Master's fee for lack of documentation and absence of legal authority for his appointment, the latter issue being addressed by the District Court and the Sixth Circuit Court of Appeals in this case. The Circuit Court ultimately decided the Bankruptcy Court had authority to appoint a Special Master for the product liability cases. *See Citibank, N.A. v. White Motor Corporation*, 23 B.R. 276, (D.C.N.D. Ohio, 1982) *rev'd.*, 704 F.2d 254, (6th Cir.,1983). Documentation will be discussed subsequently. The Creditors' Committees of WMC and WMCC objected to several applications of Squire, Sanders and Dempsey and Ernst and Whinney claiming the possibility of their receiving preferences. These objections were negated by confirmation of the plans and debtor's decision not to pursue those alleged causes of action.

The PBGC objected to various final applications but, as previously stated, these objections were withdrawn.

As trustee of the plan funds, the DAT is a party in interest regarding their distribution. At the Court's request, the DAT filed a statement of position regarding the applications to which some applicants responded. Although they are not binding, the DAT's position and the responses will be considered by the Court in determining awarding of fees.

### APPLICABLE LAW AND COMMENTS

Section 330 of the United States Bankruptcy Code provides for allowance of compensation and reimbursement of expenses to Court officers.

§ 330 **Compensation of officers.**

(a) After notice to any parties in interest and to the United States trustee and a hearing, and subject to sections 326, 328, and 329 of this title, the court may award to a trustee, to an examiner, to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney—

(1) reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

Section 503(b)(2) characterizes these awards as administrative expense. 11 U.S.C. § 503(b)(2). Bankruptcy Rule 2016 requires that applications for fees and reimbursement detail: (1) the services rendered; time expended and expenses incurred; and (2) the amounts requested.

Compensation awards must be reasonable. The accepted guidelines for fee

awards were first delineated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, (5th Cir., 1974) in which fees under the Civil Rights Act of 1964 were being considered. Those guidelines were deemed applicable to bankruptcy fee awards in *American Benefit Life Insurance Co. v. Baddock, (In re: First Colonial Corp. of America,* 544 F.2d 1291, (5th Cir., 1977)). The relevant considerations are: (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill necessary to perform the services properly; (4) the preclusion of other employment; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amounts involved and the results obtained; (9) the experience, reputation and ability of the applicant; (10) the "undesireability" of the case; (11) the nature and length of the professional relationship with the client and (12) awards in similar cases.

These factors continue to circumscribe a fee award under the Bankruptcy Code. *See In re: Casco Bay Lines, Inc.,* 25 B.R. 747, (Bankr., 1st Cir., 1982); *In re Sapolin Paints, Inc.,* 38 B.R. 807, (Bankr., E.D. N.Y., 1984); *In re: Warrior Drilling and Engineering Co., Inc.,* 18 B.R. 684, (D.C.N. D.Ala., 1981). The Court, however, is no longer bound by the spirit of economy which pervaded fee awards under the prior Bankruptcy Act. Awards are to be commensurate with those available in other areas of the law. H.Rep.No. 95–595, 95th Cong., 1st Sess., 329–330, (1977); [1978], U.S.Code Cong. and Ad News 5787, 5963, 6286.

Courts have developed an analytical framework for the award of fees which requires that initially fee awards must be determined based on the reasonable number of hours spent multiplied by a reasonable hourly rate. *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40, (1983); *Northcross v. Board of Education of Memphis City Schools,* 611 F.2d 624, (6th Cir.,1979); *Furtado v. Bishop,* 635 F.2d 915, (1st Cir.,1980). This method has been referred to as the "lodestar method" of fee setting. *Furtado, supra; Casco Bay Lines, supra.* Determination of the reasonable hourly rate and number of hours expended requires consideration of the Johnson factors. *Casco Bay Lines, supra; Sapolin Paints, supra.* The lodestar is then adjusted up or down to reflect factors which have not been considered. *Furtado, supra; Casco Bay Lines, supra.* Adjustments are made to account for quality of representation, contingent nature of the fee, success of applicant's efforts and any other factor warranting consideration.

A number of applicants herein request a premium and/or interest as an element of their fee award. The bases for the requests vary and will be considered with the individual applications. Awarding of these bonuses, however, does merit discussion.

■ Although a reasonable award can include a premium, bonus or enhancement in addition to the applicant's standard fee, exceptional circumstances are requisite. *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891, (1984). Courts have cited various circumstances which may justify a premium payment. *In re: Aminex Corp.,* 15 B.R. 356, 364, (Bankr., S.D. N.Y., 1981), the court required "extraordinary efforts and remarkable results." In the case of *In re: Idak Corp.,* 26 B.R. 793, 801, (Bankr.,D.Mass.,1982), "the amounts involved and the results obtained" were designated as primary justification for a premium payment. In general, premiums are merited when there are circumstances and factors which warrant consideration in addition to those already employed in computing the applicant's lodestar or standard fee. *See Casco Bay Lines, supra; In re: Wilson Foods Corp.,* 40 B.R. 118, (Bankr., W.D.Oklahoma, 1984); *see also In re: Penn-Dixie Industries, Inc.,* 18 B.R. 834, (Bankr., S.D.N.Y., 1982); *In re: Garland Corp.,* 8 B.R. 826, (Bankr.,D.Mass.,1981).

■ Interest per se is not an appropriate component of a fee. Applicants have no specific claim to fees and allowances until a final court order is entered. "The estates have not been holding vested sums for them by way of allowance or fees." *In re:*

*Yale Express System, Inc.*, 366 F.Supp. 1376, 1382, (D.C.S.D.N.Y.,1973); *see also In re: Fidelity Mortgage Investors*, 12 B.R. 641, (D.C.S.D.N.Y.,1981); *In re: Holiday Mart, Inc.*, 35 B.R. 181, (Bankr., D. Hawaii, 1983); *In re: Aminex, supra.* Additionally, interest confers no benefit to the estate. "The amount paid out of the debtor's estate must first and last be justified by a benefit derived by the estate, the payment of interest serves no beneficial purpose." *In re: Erie Lackawanna Railway Co.*, No. 72–2838 at 25, (N.D.Ohio, Sept. 15, 1983).

██ Interest may be appropriate as a delay factor in determining reasonable fees. In *Copeland v. Marshall*, 641 F.2d 880, (D.C.Cir.,1980), a case involving an award under the Civil Rights Attorneys' Fees Awards Act of 1976, the court noted a reasonable fee could include an upward adjustment to reflect delay in payment. Application of this adjustment in bankruptcy, however, has been questioned. In *Holiday Mart, supra*, the court held the availability of interim compensation in the bankruptcy context obviates the need for an adjustment. Finally, courts have justified interest when an award is entered and payment is delayed. *See Holiday Mart, supra.* Further, where funds are set aside for payment of fees, it is equitable that earnings thereon benefit those for whom the funds were allocated. *In re: Penn Central Transportation Co.*, 23 B.R. 499, (D.C.E.D.Pa.,1982); *In re: Erie Lackawanna, supra.* The Court concludes, therefore, that interest per se is not properly awarded. A delay factor may be considered, however, as an element of reasonable compensation.

██ In addition to requests of legal counsel, compensation is sought by accountants, actuaries, an investment banker, the Examiner and the Special Master. Criteria employed in awarding fees to attorneys are similarly applicable to all Court appointed professionals. *In re: Liberal Market, Inc.*, 26 B.R. 369, (Bankr., S.D. Ohio, 1982); *In re: International Coins and Currency, Inc.*, 23 B.R. 814, (Bankr.,

B.Vermont, 1982); and *Aminex, supra.* Compensation for the Special Master, however, requires additional discussion.

██ Determination of the Special Master's fee rests in discretion of the Court. *Newton v. Consolidated Gas Co.*, 259 U.S. 101, 42 S.Ct. 438, 66 L.Ed. 844, (1922). In allowing the Master's fees the courts have considered factors employed in an award under the Civil Rights Act of 1976. *Reed v. Rhodes*, 691 F.2d 266, (6th Cir.,1982). As previously stated these factors are generally applicable to fees under the Bankruptcy Code. *American Benefit Life Insurance, supra.* Employing these elements the Sixth Circuit Court of Appeals developed a formula for setting a Special Master's fee at "about half that obtainable by a private attorney in commercial matters." *Reed v. Cleveland Board of Education*, 607 F.2d 737, (6th Cir.,1979); *Reed v. Rhodes, supra.* While duties may differ in this reorganization proceeding, these cases are an appropriate guideline for determining the Master's fee.

Section 503(b) of the Bankruptcy Code grants administrative priority to certain creditor and indenture trustee expenses and professional fees. Specifically, Sections 503(b)(3)(D), 503(b)(4) and 503(b)(5) provide that administrative expenses shall include:

"(3) the *actual, necessary expenses*, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by (emphasis added)

'(D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, *in making a substantial contribution in a case under Chapter 9 or 11 of this title;* (emphasis added)

'(4) a *reasonable compensation* for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of com-

parable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant; (emphasis added)

'(5) *reasonable compensation* for services rendered by an indenture trustee *in making a substantial contribution* in a case under Chapter 9 or 11 of this title, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title;" (emphasis added)

■ Individual creditors, indenture trustees and counsel seek reimbursement of expenses and payment of fees under the above Code sections which provide for payment as administrative costs of actual and necessary expenses incurred by these parties "in making a substantial contribution in a case..." and for reasonable compensation for professional services. Authority for Section 503(b) is derived from Sections 242 and 243 of the former Bankruptcy Act. H.R.Rept.No. 595, 95th Cong., 1st Sess. 355, (1977); S.Rep.No. 989, 95th Cong.2d, Sess. 66, (1978), [1978] U.S.Code Cong. and Ad News 5963, 6311. The purpose of reimbursement is to promote meaningful creditor participation in reorganization proceedings. *See In re: Richton International Corp.,* 15 B.R. 854, (Bankr.S.D.N.Y.,1981); *Penn Central, supra.* Expenses and services solely to benefit the creditor, however, are not compensable.

■ Individual members of Creditors' and other appointed committees request reimbursement for travel, postage, photocopying and other expenses required in committee participation. The expenses are not authorized under Section 330 which applies only to those hired by the committees. *See In re: UNR Industries, Inc.,* 736 F.2d 1136, (7th Cir.,1984). Section 503(b), however, can be read expansively to permit reimbursement. Use of the term "including" in this Section is not limiting and can be interpreted to encompass these expenses, particularly since they were formerly allowed under then Bankruptcy Rule 11–29. *See* 11 U.S.C. § 102(3), *In re: La-*

*bine,* 42 B.R. 833, 12 B.C.D. 186, (Bankr.,E. D.Mich.,1984). *See also In re: Fireside Office Supply, Inc.,* 17 B.R. 43, (Bankr.,D. Minn.,1981); *In re: G.H.R. Energy Corp.,* 35 B.R. 539, (Bankr.,D.Mass.1983).

■ Allowance of expenses is also appropriate under subsection 503(b)(3)(D) where committee member participation substantially contributed to the proceedings. *See In re: Grynberg,* 19 B.R. 621, (Bankr.,D.Colo.,1982). This term has been construed by case law developed under the former Bankruptcy Act and the Code. In *Richton, supra,* at page 856, "substantial contribution" is defined as "services which foster and enhance rather than retard or interrupt the progress of reorganization." Committee participation herein was essential and often vital to the successful reorganization, and reimbursement of these expenses, therefore, is permissible.

■ The principal test to determine proper compensation under the Act was measurement of benefit to the estate, the creditors and the stockholders. 3 Collier on Bankruptcy, ¶ 503.04(3)(d), (15th Ed.,1984). This test continues to be the touchstone for compensating professional services.

In sum, in awarding fees and expenses, the Court employs the "lodestar," the so-called Johnson elements and applicable case law. The key statutory terms are "reasonable compensation" and "substantial contribution." Interest per se will not be awarded. A premium, bonus or enhancement will not be awarded merely because of the magnitude of the case or the availability of funds. "Extraordinary efforts and remarkable results" are required for consideration of a premium payment. "There is no entitlement to profit, only to reasonable compensation for extraordinary services of benefit to the estate." *Erie Lackawanna, supra.* Guided by these established criteria, the Court is persuaded by the length of time devoted by applicants, however, the time-clock approach is not as impressive as the remaining elements, particularly the results accom-

plished and benefit to the estate. "Compensation is not guaranteed to every creditor or lawyer who enters and takes part in a reorganization proceeding ..." Unless services are compensable under the established principles, "the amount of time and effort expended is beside the point." *In re: Philadelphia and Reading Coal and Iron Co.,* 61 F.Supp. 120, 129, (E.D. Pa.,1945). "Further, if services rendered are unproductive such as 'listening in' at hearings, or research on questions not subsequently presented, the final award will be adjusted accordingly." *Erie Lackawanna, supra.* Similarly, where compensation is sought for efforts in pursuit of self-interest with no resulting benefit to the plan or estate downward adjustments are in order. *In re: Interstate Stores, Inc.,* 1 B.R. 755, (Bankr.,S.D.N.Y.,1980).

In reviewing the voluminous applications to determine allowances, the Court is also careful to avoid becoming "enmeshed in meticulous analysis of every detailed facet of the professional representation" or to permit inquiry into the hours expended to "dwarf the case in chief." *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator and Standard Sanitary Corp.,* 540 F.2d 102, 116, (3rd Cir.,1976).

"The well-settled rule is that 'a law firm is not entitled to payment for preparation of allowance petitions. This is because the preparation of fee applications does not aid the estate.'" ... "The estate may be 'charged only one fee for a service, regardless of the number of parties involved.'" *Erie Lackawanna, supra.*

It should be noted in the DAT's report that under his supervision, an auditing committee conducted an examination of the applications herein to evaluate procedures used by applicants for recording time and disbursements. A review was conducted with each applicant regarding recording of charges and a statistical sampling was made of time and disbursement entries to assure the accuracy of the various inputs to applicant's accounting system. The "examination confirmed to the [DAT's] reasonable satisfaction that the time and dis-

bursements charged as reflected in the applications were actually incurred and were properly allocated to the accounts maintained by the applicant firms for [WMC]."

The 24 million dollar request for compensation appears staggering and overwhelming. Compared to the 1 billion dollar indebtedness of WMC and the approximate 400 million dollars in total consideration which has or will be distributed to creditors, the magnitude of the applications is not inordinate, exorbitant or disproportionate. The applicants were constantly confronted with a myriad of complex, insurmountable obstacles which they resolved most satisfactorily with commendable diligence and incomparable skill. All possessed unique expertise, extensive knowledge and vast experience which contributed immeasurably to the efficient and effective administration of this financially debilitated giant. It is indeed a tribute to the specialized talents of these outstanding professionals that this highly successful reorganization was ultimately fashioned. In brief, a masterful job very well done!

## APPLICATIONS

### I. COUNSEL.

#### A. Debtors' Counsel.

■ 1. **Squire, Sanders and Dempsey,** as co-counsel for the debtors, was totally and actively involved in every aspect of these landmark proceedings. This firm was the architect for the laudatory results achieved and greatly enhanced an enviable reputation for excellence in all phases of the law. They developed operational procedures for the debtor, prepared pleadings, documents, agreements, conducted discovery, participated in litigation, etc. They effected disposition of business assets internationally, resolved employee retiree difficulties, disposed of claims of every description, were lead counsel in all litigation and drafted and engineered plan confirmation. Their wealth of knowledge and vast experience in all phases of the law was invaluable including but not limited to the specialized fields of reorganization, bank-

ruptcy, taxes, contracts, securities, sales, labor, business, litigation etc. It is practically impossible to review and appraise the effective services performed and the magnificent contributions and results accomplished by the applicant.

This firm seeks a total fee of $2,936,-243.70 consisting of $2,557,604.51 in the WMC case, $270,893.36 in WMCC, and $107,745.83 in Gemini. Expense reimbursement of $262,664.70 is requested. A premium of $402,395.47 representing approximately 15% of the entire fee is further sought. The DAT recommends an award of 100% of fees and expenses and a premium of 10%–15%.

Applicant expended in excess of 27,000 hours in representing the debtors with renowned competence. Hourly rates range from $230.00 for certain partner time to $59.00 for associates. The hours are most reasonable as are the hourly rates which compare favorably with those charged in other areas of the law. For the monumental services which were the dominant force in producing the superb benefits in these cases, the applicant is awarded fees and expenses requested in full.

A premium award is most appropriate. Their outstanding performance exemplifies the "extraordinary efforts and remarkable results" criterion. Their entire contribution to the results achieved can only be described in superlatives. The time demands were incredible and commanded the equivalent of full-time employment of 4 attorneys from the inception of these cases. More than 100 attorneys devoted valuable specialized expertise throughout. Accolades can best be expressed by awarding a well-earned premium of 12% of their entire fee request to provide the required reasonable compensation.

**2. Levin and Weintraub and Crames.** This applicant brought to these proceedings a national reputation as one of the very finest firms in the highly-specialized field of reorganization. Their performance spoke most eloquently in justifying this deserved praise. They were deeply involved and played a central role on a daily basis in meetings, negotiating, counseling, drafting, litigating, advising and performing to perfection every vital function required to achieve the ultimate success of this case. They had the point position in virtually all Court proceedings and engineered the formulation and presentation of the extremely complex disclosure statements and plans of reorganization. Kudos abound in assessing their overall contribution.

The firm seeks $1,816,000 in fees, $1,550,000 in the WMC case and $266,000 in WMCC; $143,856.02 in expense reimbursement is also requested. In addition, counsel applied for a 15% premium on the WMC fee and interest on the interim compensation holdback. The DAT recommends an award of 100% of fees and expenses and a premium of 10%–15%.

Applicant devoted 10,675 hours of legal services. A standard hourly rate system was not employed during the WMC case. In determining requests the firm used a system akin to that employed by courts in awarding compensation. Objections to this practice are unfounded. Counsel's explanation of this system based on their bankruptcy specialization, absence of retainer clients and providing a composite rate structure for this case, assures the Court the rates are reasonable. Moreover, the DAT's audit committee approved the system. The blended hourly rate of $170.40 is reasonable considering the criteria applicable to fee awards. Counsel has substantiated hours and expenses and, therefore, is awarded compensation and reimbursement as requested.

A premium, bonus or enhancement award is merited. As stated, this firm is one of the applicants to whom the success achieved is directly attributable. Their representation was one of the very highest caliber and completely responsive to the intensive pressures and time constraints. While enjoying eminent stature, the firm is relatively small in size. The WMC cases imposed inordinate demands on their time and resources. Consequently, because of the excellent performance and the "ex-

traordinary efforts and remarkable results," a premium of 12% of the total fee request is awarded as an element of reasonable compensation. Interest per se, as previously discussed, is inappropriate and, therefore, denied.

### B. Counsel for the Committees.

**1. Hahn, Loeser, Freedheim, Dean and Wellman** served admirably as counsel for WMC Creditors' Committee, and requests an adjusted fee of $1,725,705.50 and expense reimbursement of $130,044.43. A premium of 15% and interest on the interim compensation holdback are also sought. The DAT recommends an award of 100% of fees and expenses and a premium of 10%–15%. A total of 16,300 hours is billed with hourly rates ranging from $185.00 for certain partner time to $50.00 for associates.

Counsel represented a committee of 13 official and 6 ex-officio members who were highly sophisticated. The role of these able attorneys was indeed vital in maintaining the committee as a cohesive unit despite their diverse and often adverse interests in various issues. This widely respected firm was constantly occupied in representing the committee and its interest in all activities including countless meetings, communications, gathering and evaluating financial information, counseling, advising and appearing in Court for all hearings of considerable significance. Counsel's sagacity and expertise were extremely important in all sales including WMC's assets, United States farm business, Canadian truck and farm operation, United States and Australian truck businesses, real estate transactions, WMCC and Gemini. Their knowledge and professionalism was also manifested in resolving legal entanglements resulting from pension problems, severance and vacation claims, litigation generally and innumerable additional issues. Their vast experience and enormously beneficial contribution were further evident in the sale of WMC stock and plans of WMC and Gemini. Counsel was also greatly instrumental in the laborious disposition of the PBGC claims.

In spite of their daily involvement in virtually every aspect of the cases, applicant meticulously avoided duplication of services. They substantiated hours expended and expenses incurred, and, under the applicable criteria, these items and the hourly rates charged are reasonable, and the fee and expense request is awarded in full.

Under the circumstances, a premium is appropriate to provide counsel with reasonable compensation. The case required significant dedication and commitment of time and resources for this 50 lawyer firm, 41 of whom performed specialized services in some respect. Moreover, the results obtained were extremely beneficial for the committee's constituency yielding in excess of $.53 on the dollar when early projections were considerably less. Applicant's commendable services in large measure generated this favorable distribution. In view of the firm's extraordinary efforts and results achieved a premium of 12% of their fee is a proper element of reasonable compensation and is awarded accordingly. Interest per se is inappropriate and denied.

**2. Kahn, Kleinman, Yanowitz and Arnson Co., L.P.A.** was counsel to WMC Employee Creditors' Committee. In this capacity, applicant represented employees' interests in the sensitive and vitally important area of severance and vacation pay and pension and welfare benefits. Extensive knowledge and constant vigilance to problems attendant to these issues were required and provided in abundance by this applicant. Of necessity, the firm was involved in sales of assets, plan negotiations, meetings and hearings concerning the collective bargaining agreements. As counsel for the salaried and hourly employees, applicant performed exceedingly well and most productively. Applicant requests $205,787 in fees and expenses of $6,887.66, reduced from $7,188.77 in response to the DAT's audit. The DAT recommends an award of 90% fees and 100% of expenses.

The firm expended 2,375 hours and charged rates ranging from $75.00 to $125.00 per hour, a blend of $86.65. They

often billed below their average rate for other clients. The DAT recommendation of a 10% fee reduction was premised on alleged duplication of services to which counsel responded at the evidentiary hearing. Applicant's testimony reflects "the reason for the lowered rate and for the unbilled fees was because we recognized that to a certain extent there was duplication in this particular matter." (Transcript No. 2995, page 17). Applicant's hours, hourly rate and expense request appear reasonable particularly in light of adjustment for any possible duplication. Considering the guidelines and elements of compensation, applicant's request for a $205,787 fee and expenses of $6,887.66 is awarded in full.

3. **Mansour, Gavin, Gerlack and Manos Co., L.P.A.** served as counsel to WMC Equity Security Holders' Committee and performed with alacrity, dispatch and outstanding competence. This fine firm actively participated at meetings, conferences, pretrials and various Court hearings concerning tax matters, disclosure statements and plan confirmation. They applied for fees of $64,396.25 and expense reimbursement of $4,174.25 to which the DAT recommends an award of 90% fees and 100% expenses.

Applicant spent 612 hours in performance of duties at hourly rates ranging from $120.00 for partners to $90.00 for associates. Counsel was diligently involved in WMC proceedings and conducted various investigations for committee members. Partly attributable to applicant's contribution, the stockholders received a stock distribution under the plan. While the DAT suggests some efforts were of doubtful benefit to the estate, it is clear they were sufficiently beneficial to warrant requested awards.

Review of the hours, expenses and hourly rates reflects they are most reasonable, and applicant is accordingly awarded 100% of fees and expenses requested.

4. **Arter and Hadden.** As counsel to the Creditors' Committee of WMCC, applicant was appointed on October 4, 1980 in a case where the plan was confirmed December 21, 1981. Although 70% interim fee was paid, some time has lapsed since services were terminated. Applicant actively represented the committee with daily involvement in numerous meetings, hearings, pleadings, preference matters, disclosure statement and plan confirmation. Performance of these duties was highly commendable.

Applicant requests $161,019.50 fees, $30,917.56 expense reimbursement and interest at 15% per annum on the interim compensation holdback. The DAT recommends 90% of fees and 100% expenses.

The firm devoted 1,950.7 hours at rates ranging from $60.00 to $100.00 per hour, an average hourly rate of $81.00. Counsel represented a sophisticated committee, the co-chairmen and various creditors of which played an extremely active role. Demands upon counsel, however, were onerous and performance of services most admirable. Applying the compensation standards and considering the relatively low hourly rate and delay since termination of duties in late 1981, the Court awards reasonable compensation for 100% of fees and expenses requested. Interest per se is denied.

5. **Nadler and Nadler Co., L.P.A.** The services rendered by applicant as counsel to Creditors' Committee of Gemini involved research, consulting with committee members, attending meetings and Court hearings and advising on proposed sales, disclosure statement and plan. A substantial portion of time was directed to reviewing documents and reporting to the members. For the substantive consolidation issue, of prime importance to Gemini creditors, applicant obtained co-counsel. Services were performed well and were generally beneficial to the estate.

Applicant requests fees of $126,980.60 and expense reimbursement of $5,569.95. They also seek a bonus in the form of recalculating previously charged fees at $135.00 per hour. As such, the premium would be $20,790.40, approximately 16% of the fee. The DAT recommends 90% payment of fees, 100% expenses and no premium.

The firm expended 1,094.6 hours at hourly rates from $100.00 in the first interim application to $135.00 in the final. While applicant substantiated hours and expenses, there is justification for the DAT's recommendation since the issues in Gemini were not as complex or demanding as those encountered in the other White cases. Considering the delay factor since services were completed and employing the applicable fee principles, the Court awards 100% fee as reasonable compensation and expenses requested. A premium per se is unwarranted.

### C. Special Counsel.

Numerous appointments were made to provide the debtor and committees with specialized legal counsel and general representation.

**1. Greene and Hennenberg.** Applicant served as special counsel to Creditors' Committee of Gemini from March 1, 1982 to November 10, 1982. Their primary function was directed to the issue of substantive consolidation to which considerable time was devoted. Many hours were spent becoming familiar with the entire proceedings, conducting legal research and discovery and generally preparing for litigation.

The firm requests a fee of $136,428.78, reduced to $135,000 to conform with debtor's confirmed plan. An expense reimbursement of $1,890.48 is also submitted. The DAT recommends an award of 70% of fees or $94,500 and 100% of expenses to which applicant filed a response.

This firm which specializes in litigation logged 1,032.75 hours at $150.00 per hour for certain partner time to $75.00 for associates. The quality of services is not questioned, however, the substantive consolidation issue on which significant hours were expended was never litigated. Although diligent preparation is vital and counsel's efforts were efficiently performed, the element of benefit must be satisfied. Expenditure of time in gaining familiarity with the case and trial preparation on the consolidation issue proved ultimately of little benefit

to the estate. "Further, if services rendered are unproductive or . . . on research of questions not subsequently presented, the final award will be adjusted accordingly." *Erie Lackawanna, supra.*

Considering that the service generally did not contribute to the plan or benefit the estate, and applying the remaining criteria, the Court awards a 90% fee ($121,500) as reasonable compensation and 100% expenses requested. This award accounts for time not requested due to the ceiling in the plan and for the delay since services were terminated.

**2. Baker and McKenzie.** This applicant was retained as special counsel to WMC because of its expertise in international matters. Services were provided various foreign entities of WMC throughout the world with emphasis on the Australian operation and trademark issues.

Applicant seeks $98.048.28 in adjusted fees and $32,894.32 in expense reimbursement. Time logged is 1,014.8 total hours at an average hourly rate of $96.84. The applications, however, are inconsistent in reflecting the hourly rates. Where they are revealed a range from $55.00 to $165.00 per hour is indicated.

The DAT recommends an award of 90% of the fees and 100% of the expenses requested. The applications indicate duplication of effort. Furthermore, the hourly rates charged for various services are impossible to decipher. Considering these factors and the criteria for compensation, the Court awards applicant 90% of requested fees or $88,243.45 as reasonable compensation for services rendered. Expenses are substantiated and awarded in full.

**3. Schramm and Raddue.** Applicant was retained as special counsel to WMC and performed services in an excellent, professional and highly productive manner. They concentrated on product liability lawsuits in California and six other Western states, resolved a sizeable number and also contributed immeasurably in developing the product liability case disposition programs. Many of the lawsuits were pre-pe-

tition, extremely large and seriously jeopardized estate assets. Consequently, to merely state that applicant's services contributed substantially and were highly beneficial to the estate is a gross understatement.

The firm requests fees of $230,042.63 and expense reimbursement of $32,623.31. The DAT recommends an award of 100%.

Applicant devoted 2,763 hours at rates ranging from $60.00 per hour for associates to $125.00 for partners, an average hourly rate of $83.00. These rates were well below those charged regular clients in consideration of debtors' limited resources. The hours expended, rates charged and expenses requested are most reasonable. An award of 100% of fees and expenses is, indeed, appropriate.

The following 8 applications are submitted by counsel retained to perform services in highly specialized areas of the law. The 8 firms are placed in one category because requests are considerably less than the other applicants. Without exception, these services were performed admirably to the complete satisfaction of the DAT who recommends awards of 100% of fees and expenses.

**4. Cragg and Bailly, Ltd.** This applicant represented WMC in substantial product liability litigation which, after extensive and effective preparation, was successfully resolved. The firm asks for $17,402.50 in fees and expense reimbursement of $6,238.12 representing 236 hours of service at an average hourly rate of $74.00.

**5. Fasken and Calvin.** Applicant assisted WMC in the sale and dissolution of Canadian subsidiaries. The knowledge and contribution involving insolvency law, litigation, tax and corporate issues were extremely valuable to WMC. A fee of $47,-385 and expense reimbursement of $3,070.70 in Canadian currency are requested for 414 hours of service at an average hourly rate of $100.00.

**6. Garrity, Connolly, Lewis, Lowry and Grimes.** Specialized expertise was required of this applicant to resolve claims

and related tax matters posed by the Internal Revenue Service. Favorable disposition of these knotty problems was effected through the direct efforts of this firm. A fee of $2,877.50 and expense reimbursement of $643.39 is submitted for 16.9 hours of service at $175.00 per hour.

**7. Harries, Houser.** The skillful services of this firm were highly beneficial to WMCC by advising and guiding the committee through all phases of Canadian law pertaining to the successful plan of reorganization. Applicant requests $27,891.41 in fees and $2,665.31 in expenses for 253 hours at an average hourly rate of $110.00.

**8. Hughes Hubbard and Reed.** Applicant was retained as special counsel to pursue a sizeable claim of WMC against General Electric Company Limited in New York State. Extensive, complex preparation was required and the ultimate disposition of this difficult suit was very successful. For these services the firm requests $20,721.45 in fees and $678.37 expense reimbursement for 192 hours service at $108.00 average hourly rate.

**9. Locke, Reynolds, Boyd and Weisell.** Services rendered by applicant to WMC in various matters of litigation were highly beneficial to the estate. Request is made for fees of $945 and expense reimbursement of $19.42 for 17 hours service at an average hourly rate of $57.00.

**10. Lockwood, Dewey, Alex and Cummings.** The processing of patents in Canada by this specialist was vital and beneficial to the estate. Compensation is sought for $1,957 and expense reimbursement of $239.14 for 32 hours service at a $61.00 average hourly rate.

**11. Watts, Hoffmann, Fisher and Heinke Co., L.P.A.** Specialized services as patent counsel were performed and produced notable benefits. Applicant requests $15,513.50 in fees and $3,779.81 in expenses for 300 hours service at rates ranging from $70.00 to $110.00 per hour.

A review of the foregoing 8 applications reflects the reasonableness of the time spent, the hourly rates charged and fees

and expenses requested. Services generally were extremely beneficial to the estate. Applicants, therefore, are awarded 100% of their fee and expense requests.

## II. OTHER PROFESSIONALS.

### A. *Accountants.*

■ **1. Ernst and Whinney.** On a daily basis this applicant provided a wide range of accounting services for WMC, WMCC and Gemini. Audit related data was compiled and provided for virtually every vital transaction. They contributed significantly to the various dispositions of businesses and assets so highly beneficial to the estate. Substantial accounting, tax, research and consulting work was required for considerably complex issues under inordinate time demands. The number of personnel assigned to this reorganization also precluded the applicant from engaging other employment. Applicant's skillful talents, unquestioned ability and national reputation for excellence were manifestly evident in the overall performance which contributed immeasurably to the successful results achieved in this vast proceeding.

Applicant applied for fees of $3,189,971 and expense reimbursement of $267,582. In addition they request a $200,000 premium and interest of approximately $407,104. The DAT recommends payment of 100% fees and expenses and a premium of 10%–15%.

Applicant expended 44,715 hours in the debtors' service. The average rate for partner time ranged from $131.23 to $173.93 per hour. Average rates for other employees were $99.19 per hour for managers, $62.38 for supervisors and $41.17 for staff accountants. They substantiated the reasonableness of their hours, time charges and expenses under the applicable criteria. For reasons stated, fees and expenses are, therefore, awarded 100% as requested.

Due to applicant's "extraordinary efforts and remarkable results," a premium is justified. An unusual degree of commitment was required to resolve myriad, complex issues. Applicant was a catalyst in structuring and negotiating sales of considerable benefit to the estate. A premium of 12% is, therefore, awarded as an element of reasonable compensation. Interest per se is denied as previously discussed. The premium award compensates for any delay in receiving payment.

**2. Touche Ross and Co.** Accounting and consulting services were provided WMC from September 7th through October 9, 1980, a period of one month. These brief services in the early, preliminary stages of proceedings were terminated due to conflict of interest. Since they were ephemeral, the services were not novel, unique or of any apparent benefit throughout the reorganization or to the ultimate results achieved.

Applicant requests $165,000 in fees and $16,601 in expense reimbursement to which the DAT recommends an award of 70% of fees and 100% expenses. They logged 1,662 hours service with partners billing at $170.00 per hour or less and staff at $77.00. No compensation is asked for additional hours allegedly served.

Due deliberation is given the nature and kinds of services and the time and circumstances under which they were performed in the one-month period. By applying the applicable criteria, the Court awards 75% requested fees as reasonable compensation and 100% expenses, consideration having been given the alleged unbilled time.

**3. Coopers and Lybrand** served efficiently, capably and productively as accountants to WMCC Creditors' Committee. They request $371,559 fees, $35,940 expense reimbursement and interest of 15% on the interim payment holdback. Although applicant's order of retention placed a $250,000 ceiling on their fee, the DAT recommends an award of 100% of requested fees and expenses.

Applicant billed 4,428 hours and charged $165.00 per hour for partner time and $26.00 to $110.00 per hour for staff. The application reflects this firm was extensively involved in the critical areas of the WMCC case. They played a significant role in formulating and drafting operating orders and the complicated plan of reorga-

nization. "... Coopers and Lybrand's performance achieved all that the creditor could have hoped for from the viewpoint of protection, of creativity, of operating agreements that would allow WMCC the flexibility to operate and yet afford those creditors the protection that they felt and, I think, appropriately so deserved under the circumstances." (Transcript No. 2948, page 200, Testimony of Wallace B. Askins).

Because of the extensive and highly professional services which produced excellent benefits and results for the estate, applicant is awarded 100% of fees and expense requested. In determining this reasonable compensation, the Court disregarded the ceiling on fees thereby rendering consideration of a delay factor inappropriate. Interest per se is denied.

**4. Peat, Marwick, Mitchell and Co.** Accounting services of this applicant consist in large measure of reviewing documents prepared by other accountants and counsel and reporting to and educating the WMC committee. A substantial portion of time charged was attendance at committee meetings. Services were curtailed early in the proceedings and there is no apparent benefit or contribution to the success of the results achieved.

Applicant seeks fees of $321,648 and expense reimbursement of $55,390. An untimely request for interest on the interim holdback was submitted by letter of January 14, 1985, received by the Court on January 17, 1985. Applicant's order of retention establishes a $250,000 limit on fees. The DAT recommends an award of 70% of fees, which exceeds the limit, and 100% expenses.

Applicant bills 2,991 hours service to the committee at hourly rates of $150.00 for partners, $100.00 for manager time and $72.00 for supervisors. The average hourly rate was $108.00. Evidence presented by applicant at the fee hearing reflects total disregard of the imposed fee limit. (See Exhibits 32-09 to 32-12, Transcript No. 2948, pages 240-243, Testimony of Louis Zircher and Wallace B. Askins.) Considering the kinds and level of services,

when performed and how effective and productive to results achieved, the Court awards 80% of fees and 100% expenses requested as reasonable compensation. Request for interest is untimely, inappropriate under applicable law and, therefore, denied.

### B. Actuaries.

During these proceedings, three actuaries were retained who performed highly specialized services of significant benefit to the estates. The DAT recommends an award of 100% of fees and expenses for all three applicants.

**1. George B. Buck Consulting Actuaries, Inc.,** actuarial consultant to WMC Creditors' Committee, prepared and submitted vital analytical evaluations concerning major, complex pension issues. The data assessed and presented at various meetings was extremely valuable to committee members and the estate. A fee of $60,576 and expense reimbursement of $3,467 is requested for 394 hours service at hourly rates from $48.00 to $250.00.

**2. Milliman and Robertson, Inc.** provided actuarial services in developing analyses of retiree claims and contributing laudably to creation of the Retiree Trust. This unique concept was extraordinarily beneficial to the retiree creditors. Applicant seeks $47,027.50 in fees and $8,782.83 in expense reimbursement. The firm expended 455.5 hours at hourly rates of $150.00 for principals, $95.00 for staff actuaries and $45.00 for technical support.

**3. Poulin Associates, Inc.** were actuarial consultants to WMC Employee Creditors' Committee. Their expertise in the area of pension and welfare benefits provided significant benefit to the estate. They request a fee of $38,447.50 and expense reimbursement of $4,769.76 for 295.75 hours service at an hourly rate of $130.00.

These 3 applicants whose specialized talents and valuable services provided a substantial contribution to the estate are

awarded 100% fees and expenses requested as reasonable compensation.

### C. Other Specialists.

**1. Lazard Frères and Co.** Applicant provided extensive and productive investment banking and consulting services to WMC, WMCC Creditors' Committee and the Examiner. They were deeply involved in the asset disposition transactions which produced in excess of 150 million dollars for the estate. Their performance in these vital areas and others constituted a substantial benefit to the creditors.

Pursuant to Court's orders retaining this applicant, a pre-arranged fee of $1,650,000 and expenses of $69,019.08 have been paid. In view of the results achieved, the previously authorized fee and expense award is, indeed, reasonable.

**2. Special Master, Attorney Sam A. Zingale.** Mr. Zingale was appointed as Special Master to assist in resolving approximately 160 product liability claims pending against WMC. He worked diligently and productively with counsel, consultants and the Examiner in formulating and implementing the claims disposition program. For these services Mr. Zingale requests $73,306.25 in fees and $2,379.63 in expenses. The DAT recommends an award of 70% fees and 100% expenses.

Applicant billed 488.57 hours service at $150.00 per hour. Mr. Zingale is a former Judge who is well qualified for his appointed role and contributed immeasurably to resolving numerous, difficult claims. The Court recognizes and appreciates the benefits conferred upon the estate directly resulting from Mr. Zingale's efforts. The hours expended are reasonable. The hourly rate of $150.00, however, requires additional consideration. As previously discussed the Sixth Circuit Court of Appeals has delineated guidelines for the award of a Special Master's fee; namely, "about half of that obtainable by a private attorney in commercial matters." *See Reed v. Cleveland Board of Education,* 607 F.2d 737, (6th Cir.,1979); *Reed v. Rhodes,* 691 F.2d 266, (6th Cir.,1982). Because of the gener-

al increase in hourly rates since these parameters were enunciated, this Court believes a 50% reduction of the $150.00 hourly rate is unconscionable. Considering this factor and the magnitude and complexity of the claims serviced, Mr. Sam Zingale is awarded reasonable compensation at the hourly rate of $135.00 or $65,956.95 and 100% expenses of $2,379.63.

**3. Examiner.** The Firm of **Climaco, Seminatore and Lefkowitz** served commendably in this capacity in the WMC and WMCC cases. They request $1,125,256 fees, $1,110,682 in WMC and $14,574 in WMCC, plus expenses of $77,090. A premium of $165,000 is also sought.

The Examiner's office expended 11,278 hours in performance of duties at hourly rates ranging from $60.00 for associates to $150.00 for certain partners. The DAT recommends an award of 100% fees in WMCC, 90% fees in WMC and 100% expenses to which the applicant responded.

The function of the Examiner is enunciated under 11 U.S.C. § 1104(b) "to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor...."

The Examiner's performance herein was broad in scope, highly productive and most beneficial to results achieved. The following excerpts from fee hearings speak eloquently in this respect. "The Examiner brought to the case a representation of those interests that, in my judgment, would not have existed without that role and a representation that was critical to maintain that balance." (Transcript No. 2948, page 115, Testimony of Wallace B. Askins). "Obviously I believe that the Examiner made significant and substantial contributions to the White Motor reorganization." (Transcript No. 2948, page 119, also Mr. Askins). The Court concurs and lauds the Examiner's efforts which conferred considerable benefit to the estates. He provided an independent, investigative role at the

Court's request. Duties commendably performed included valued analyses and decisions on vital issues which proved significantly beneficial. Review of the Examiner's hours, rates averaging $86.00 per hour and the expenses satisfies the "reasonable" requirement under the applicable criteria. Specifically noted is the audit committee's approbation of the firm's time keeping methods. The Examiner is, therefore, awarded 100% of the fee and expense request in both WMC and WMCC.

Award of the $165,000 premium request is not warranted. The Examiner's duties as stated above, were performed efficiently and effectively. The final report of services rendered for the two-year period was submitted on November 2, 1982, substantially prior to filing and approval of the WMC disclosure statement and confirmation of the plan. The report is artfully drafted and meticulously details possible causes of action to be pursued by the debtors who, ultimately, decided to the contrary. Although the Examiner's performance was a "job well done," the services cannot be characterized as "extraordinary efforts and remarkable results" required to justify a premium award. A fee allowance of $1,125,256, 100% of request, is reasonable compensation. With reimbursed expenses of $77,090, the total award is $1,202,346.

**4. Stanley Tulchin Associates** served admirably as Secretary to the WMC Creditors' Committee and requests $24,325 in fees and $9,068.95 in expenses. The DAT recommends payment of 100% fees and expenses.

The application reflects 320 hours service at $75.00 per hour. As a specialist in creditor representation, they attended all creditor meetings, recorded minutes, provided notices and performed other related services most beneficial to the estate. Requested fees and expenses are reasonable and awarded accordingly.

### III. CREDITORS.

#### A. Committees; Reimbursement of Expenses.

■ Various Creditors' Committees applied for reimbursement of expenses incurred by members in Committee activities; specifically, WMC ($208,881.49), WMCC ($73,750.17), WMC Equity Security Holders' Committee ($1,876.33) and WMC Employee Creditors' Committee ($3,288.88). As considerable travel was required for meetings and Court hearings conducted in various states, particularly by WMC and WMCC Committee members, their participation and contribution proved essential and beneficial to the favorable denouement of these cases.

Counsel substantiated expenses incurred in travel, postage, long distance calls and other related activities. As previously discussed, 11 U.S.C. § 503 authorizes reimbursement. Consequently, requested expenses are awarded accordingly.

#### B. WMCC Creditors.

Four WMCC creditors request fees and expenses under 11 U.S.C. § 503(b)(3)(D) and § 503(b)(4), alleging substantial contribution to the case. They are (1) Citibank, N.A., agent for the Bank Group represented by Shearman and Sterling and Baker and Hostetler, (2) The Prudential Insurance Company of America and other lenders by counsel Weil, Gotshal and Manges, (3) New York Life Insurance Company by the firm of Kramer, Levin, Nessen, Kamin and Frankel and (4) The First National Bank of Chicago and Chemical Bank with Zalkin, Rodin and Goodman as counsel. Applicants also filed claims for reimbursement of fees and expenses pursuant to various financing agreements. Under the confirmed WMCC plan these 4 creditors are limited to 2 million dollars whether their claims are miscellaneous contract claims under the plan or reimbursement under Section 503. Applicants expressed desire to proceed under Section 503. In some cases they have not filed claims for total fees and expenses. The Court, therefore, will consider the applications under Section 503 and the contract claims are disallowed.

**1. Citibank, N.A.** served as co-chair of the Committee and applied for their coun-

sels' fees of $696,932.48 and expenses of $109,122.49. They were represented by New York counsel, Shearman and Sterling and locally by Baker and Hostetler. Interest payment is also requested. The DAT recommends an award of $829,000 for fees and expenses.

As one of the largest creditors and agent for the Bank Group, applicant played a primary and significant role in these proceedings. They were involved in virtually every vital issue attributable to the success of the case including drafting various operating orders and the plan. They were instrumental in plan confirmation by the end of 1981 just 15 months after the case was filed. Applicant's efforts clearly constitute "substantial contribution" for creditors and the estate.

Counsel devoted 5,409 hours of commendable, productive service. Average hourly rates of $130.67 for Shearman and Sterling and $99.79 for Baker and Hostetler are most reasonable. The DAT's recommendation is discounted since it considered the contractual claim which has been disallowed. Applicant's role warrants an award as requested of $696,932.48 in fees and $109,122.49 in expenses. Interest is denied under applicable law and further because the Court's award to the four WMCC creditors consumes their entire 2 million dollar allocation.

**2. The Prudential Insurance Company of America.** Prudential and various other lenders were represented by Weil, Gotshal and Manges who applied for $620,177.80 in fees and $61,558.53 in expenses in their behalf. Interest is also sought. The DAT recommends a total award of $671,000.

Prudential was co-chair of the Creditors' Committee and an active, central player in the reorganization. Applicant also contributed materially to prevention of substantive consolidation. They participated in appointment of a separate White Credit Creditors' Committee and in retention of an independent accountant. Co-drafting and negotiating the operating order and plan were major factors in effecting the successful results. Applicant's contribution was substantial and of considerable benefit to creditors and the estate.

Counsel served 6,275 hours at an average hourly rate of $98.00 and their fees and expenses are reasonable under the enunciated criteria. Review of the application reflects their highly professional services greatly enhanced these proceedings. Applicant is, therefore, awarded $620,-177.80 in fees and $61,558.53 in expenses. Again, the DAT's recommendation took into consideration the disallowed contractual claim and, consequently, is discounted. Since the awards to WMCC creditors deplete the 2 million dollars allotted in the plan, and interest is unwarranted under applicable law, no interest payment is awarded.

**3. New York Life Insurance Company** was a member of WMCC Creditors' Committee. Their able counsel, Kramer, Levin, Nessen, Kamin and Frankel, applied for $240,205 fees and $7,041.12 expenses in their behalf. A supplemental request for interest was also filed. The DAT recommends fees and expenses of $230,000.

Applicant was a senior creditor and the largest subordinated creditor holding 85% of that debt. Subordinated debt was treated as a separate interest in all negotiations and applicant was recognized as the de facto representative. As a member of several subcommittees, applicant actively participated in most aspects of the case. Among their more significant contributions was the proposal of compromise protecting subordinated debt in the interim distribution. They also played an important role in effectuating portions of the "Intercreditor Agreement," an exhibit to the plan which preserved rights of junior debt and defined creditors' relative rights.

Counsel devoted 1,583 hours at an average hourly rate of $151.74. The application indicates the hours served, expenses incurred and rates charged are reasonable. While an award of substantially all of applicant's fees and expenses is justified, the Court is limited by the 2 million dollar cap imposed by the plan. An award of 100% fees and expenses requested by the 4 appli-

cants exceeds the 2 million dollar ceiling by $45,869.32. Applicant and First National Bank of Chicago were clearly vital contributors to the case. Their efforts, however, were somewhat less crucial to reorganization than those of the Committee co-chairmen. For this reason, it is appropriate to make 100% awards to the co-chairmen and, in conjunction with the ensuing discussion of First National's application, to award New York Life 100% of their request less $22,934.66. This reduction is one-half the total amounts requested in excess of the 2 million dollar restriction. New York Life is, therefore, awarded $224,311.46. Based upon applicable law and the 2 million dollar cap in the plan, no interest is allowed.

**4. The First National Bank of Chicago** served as a member of the WMCC Creditors' Committee and Chemical Bank was a creditor. Their counsel, Zalkin, Rodin and Goodman, seeks fees of $272,456.92 and expenses of $38,374.98 in their behalf. An award of $270,000 for fees and expenses is recommended by the DAT.

Applicant and its clients contributed to numerous facets of this reorganization including committee formation, interim distribution, preparation of the operating order and effecting various sales of assets. Applicant submitted their own proposed plan of reorganization and were significantly involved in the confirmed plan. They actively participated in all negotiating and drafting sessions of the plan. They drafted Article 14.02(e) therein providing for retention of jurisdiction respecting future sales. This section aided compromising the parties' varying interests which threatened to impede a consensual plan. Applicant's efforts were indeed beneficial to the estate and creditors.

Counsel expended 2,147.1 hours at an average hourly rate of $126.89. The rate, hours and expenses are reasonable under applicable criteria. Applicant contributed immeasurably to the case. In conformance with the reasoning set forth in the previous application, First National is awarded 100% of their request less $22,934.66, or $287,-897.24.

### C. WMC Creditors.

WMC creditors requested awards of expenses and counsel fees under 11 U.S.C. § 503(b).

**1. Citibank, N.A.** agent to the Bank Group which held 80% of outstanding debt for borrowed money, served as co-chairman of the Creditors' Committee. They were represented by Shearman and Sterling and Baker and Hostetler and seek $1,491,674.80 in fees and $139,941.69 in expenses. To allow for any services that may have solely benefitted the applicant, requests were reduced 5% from counsels' total billings. At the hearing the expense request was amended to reflect 100% or $147,307.04. The fee sought consists of $1,267,300 for Shearman and Sterling and $224,374.80 for Baker and Hostetler. The DAT recommends an award of 90% of Shearman and Sterling's total fees, 40% of Baker and Hostetler's and 100% expenses.

Applicant, through counsel Shearman and Sterling, was deeply involved in virtually every aspect of the case. They actively participated in the sale of WFE and were instrumental in resolving a dispute with the PBGC which relieved the debtors of 40 million dollars in pension liability. They effected sale of the Canadian businesses. Sale of the truck operation was greatly enhanced by their efforts in drafting certain financial provisions. Applicant resolved various issues which impeded adoption of a consensual plan. They negotiated with senior public debt holders and the retirees' representatives. The results achieved through settlements are reflected in the plan. Counsel's contribution in structuring the plan and developing the stock purchase agreement was monumental.

Shearman and Sterling's promotion, development and negotiation of various sales were extremely beneficial to the estate. To determine the percentage of services solely benefitting the applicant rather than the estate is obviously impossible. A fair assessment of the application, however, re-

flects the greatest portion of services rendered, indeed, benefitted the estate.

Baker and Hostetler were local counsel for Citibank. The application identifies their role as a clearinghouse for information relating to all developments in the case in Cleveland. They attended "order days" and prepared summaries for the Bank Group and New York counsel. They reviewed claims for the Bank Creditors, filed and reconciled them with the claims register. Significantly, they researched appointment of the Special Master and prepared and filed pleadings in opposition thereto. They ably argued the appeal in the District Court and in the Sixth Circuit Court of Appeals. Baker and Hostetler's efforts in large measure were devoted to representing their clients' interest, but there was, however, an indirect and direct contribution to the case in general.

Shearman and Sterling expended 9,685 hours in the WMC case at an average hourly rate of $137.74. The hours, rates charged and expenses incurred are reasonable under applicable criteria. The Court considered the DAT's recommendation and believes an award of 90% of total fees is equitable and compensates for substantial contribution. This percentage also accounts for counsel's efforts which solely benefitted their clients.

Baker and Hostetler devoted 2,576.5 hours at an average hourly rate of $91.60. The hours expended, rates charged and expenses are reasonable. Although counsel's endeavors primarily benefitted their client, the services indirectly contributed substantially to the estate. The Court readily appreciates the DAT's 40% recommendation but believes 80% of Baker and Hostetler's total fee is appropriate to compensate for services beneficial to the estate.

Applicant is, therefore, awarded $1,389,547.20 in fees and 100% of expenses, $147,307.04, a total award of $1,536,854.24.

**2. The Mutual Life Insurance Company of New York** served as co-chairman of the Creditors' Committee. The firm of Wachtell, Lipton, Rosen and Katz represented Mutual Life and other creditors including John Hancock Mutual Life Insurance Co., a Committee member. On behalf of the clients, counsel seeks $997,409.25 in fees and $63,795.73 in expenses which is 90% of their billing to the client. At the hearing, counsel amended the expenses to $70,884.14 or 100%. The DAT recommends payment of 100% fees and expenses requested.

Counsel and clients were omnipresent throughout these proceedings with particular involvement in the debtors' sale of assets. When it was determined the WMC "stand alone" plan was not feasible, applicant actively participated in the ensuing negotiations to develop a consensual plan. Notably, they effected settlement with the equity holders and subordinated debenture holders thereby avoiding possible objections to the plan. When disputes arose in the A.B. Volvo agreement, counsel's expertise and conciliatory efforts were highly instrumental in producing 4 million dollars above the original estimated purchase price. Applicant was also active in formulating the WMCC plan of reorganization. As a creditor of WMC their laudatory efforts in negotiating issues of substantive consolidation, payment on WMC equity interest and preventing delay of confirmation were considerably beneficial. Generally, counsel's lead role and productive participation in all phases of these proceedings are too numerous to recite. Unquestionably, their skillful talents conferred a substantial contribution upon the estate.

Applicant devoted 6,624 hours at rates ranging from $60.00 to $257.00 which, along with expenses incurred, are reasonable. Applicant discounted the total fee by 10% to allow for services performed solely for the client. The remaining 90% of fees was clearly for services beneficial to the estate as reflected in the DAT's recommendation. Applicant is, therefore, awarded fees and expenses as requested, an award of $1,068,293.39.

**3. Bank of America, National Trust and Savings Association,** a member of the Creditors' Committee, was represented by Fried, Frank, Harris, Shriver and Jacobson

who request $275,000 in fees and $21,944.25 in expenses in their behalf. Due to an overcharge, the expenses were amended at the hearing to $20,951.23. The DAT recommends an award of 70% of fees and 100% expenses.

Applicant's involvement in the case included negotiating a compromise agreement with the Examiner thereby allowing joint retention of the Investment Banker. This contribution enabled the debtors to dispose of the truck business with dispatch and on favorable terms. Applicant also participated in the WMCC plan formulation and sales of assets. Their duties further encompassed resolution of various claims and effecting the agreement by which employee health benefits were maintained pending final resolution in the plan. They promoted the concept of the Bankruptcy Court as the sole forum for settling product liability claims and further participated in preparing the disclosure statement.

Counsel billed 2,302.5 hours to WMC at a reasonable average hourly rate of $118.55. The majority of applicant's efforts benefitted the estate, however, participation, generally, was less direct and pivotal than the contribution of other creditors. This distinction was cited by the DAT in his recommendation of a 70% award. Counsel's application also fails to detail and itemize the time charges. For enumerated reasons, the Court believes 75% of the fee request and 100% of expenses is reasonable compensation and accordingly awards applicant $227,201.23.

**4. Eaton Corporation,** a member of the Committee, applied for $24,124.25 in fees and $227.12 in expenses. They were represented by the firm of Jones, Day, Reavis and Pogue. The DAT recommends a 100% award.

Applicant requests reimbursement of fees and expenses for specific projects undertaken in Committee participation. Specifically, they headed the trade creditors group and were instrumental in selecting a WMC Committee co-chairman independent of WMCC. They further negotiated with WMCC concerning the operating agreement and plan, explored distribution to benefit trade creditors under the plan and evaluated the Examiner's report. Requested fees represent only 17.7% of total fees incurred by Eaton in the WMC case. Applicant seeks reimbursement for 170 hours at an average hourly rate of $141.00. The hours and fees are in order and represent reasonable compensation for services beneficial to the WMC case. Applicant is awarded 100% of request or $24,351.37.

**5. The Equitable Life Assurance Society of the United States,** a member of the Creditors' Committee, retained the firm of Kaye, Scholer, Fierman, Hays and Handler. Equitable requests fees of $78,050, while the DAT recommends an award of 40% of this figure.

Applicant was the largest institutional trade creditor. As a member of the accounting subcommittee, they reported to the Committee on securities law and various issues concerning creditors' receipt of stock under the plan. In this limited area their contribution was substantial. However, they cite cooperating with the Examiner's investigation and continuing insurance for WMC employees as compensable services. Obviously, the Court is unable to award fees for these so-called contributions.

Equitable seeks reimbursement for 656 hours of attorney time at an average hourly rate of $119.00. The records reflect considerable time expended for the sole benefit of the clients including research of claims and insurance. From a thorough analysis of the application and having considered the DAT's 40% assessment, the Court believes 50% of the requested fee reasonably compensates and reimburses applicant and accordingly awards $39,025.

**6. Dana Corporation,** a Committee member, was represented by Kronish, Lieb, Shainswit, Weiner and Hellman. Counsel applied on their behalf for $27,329 in fees and $2,074.89 in expenses. The DAT recommends an award of 40% fees and 100% expenses to which Dana filed a response.

Dana cites and relies upon counsel's efforts concerning the Examiner's final report as a basis for the requested award. Applicant researched the causes of action set forth by the Examiner and concluded that debtor's decision not to pursue them was reasonable. Since the Committee supported this decision which some creditors disapproved, Dana recommended and structured Article XIII of the confirmed plan to protect Committee members.

Applicant seeks an award for 204 hours at an average hourly rate of $125.00. This rate is reasonable and the Court appreciates the benefit to the estate from counsel's limited role with the Examiner's report. The application, however, reflects ambiguities in counsel's expenditure of time and various items. Consequently, an award of 45% of requested fees and 100% of expenses is warranted and applicant is, therefore, awarded $14,372.94.

**7. The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW).** The UAW, a member of the Creditors' Committee, requests $333,249 in fees and $19,938.62 in expenses. They were represented by staff attorney Claude D. Montgomery, who joined the firm of Booth, Lipton and Lipton effective September 6, 1983. The firm of Craig and Macauley also served as UAW counsel. Various fees and expenses of the UAW professional staff are included in the request. The DAT recommends an award of 70% of fees and 100% expenses.

The UAW represented certain WMC employees and retirees. Their efforts were primarily focused on preserving and continuing retiree health benefits and resolving the attendant claims. They were principal negotiators for Class 6 of the plan which benefitted salaried employees and UAW's constituents. The UAW also effectuated settlement of the gap pension liability claim and the plant closing agreement. In sum, they provided novel, vital and substantial contributions to this case.

The fees requested by Mr. Montgomery are for 1,221 hours at the rate of $125.00 per hour. Craig and Macauley devoted 1,386 hours at rates ranging from $70.00 to $140.00 per hour. The UAW support staff billed hourly charges from $60.00 to $80.00 for 747 hours. The staff is awarded 100% of fees and expenses for beneficial services rendered to resolve issues related to Class 6 of the plan.

As stated, counsels' primary concentration was fashioning Class 6 and resolving employee benefit claims. Their Committee participation was also important. Taking into consideration counsels' overall services rendered, their contribution to the estate and the DAT's assessment and recommendation, the Court awards reimbursement of 100% of expenses and 75% of fees requested by Craig and Macauley and 85% to Mr. Montgomery. The total award to the UAW is, therefore, $297,600.37. The Court highly commends attorney Claude D. Montgomery for his excellent professional skills and talents manifested throughout these proceedings to the benefit of all including the Court.

**8. J. Henry Schroder Bank and Trust Company.** Under an indenture governing certain convertible, subordinated debentures, applicant was trustee and also served as an ex-officio member of the Committee. They seek $16,388 in fees and $16,375.56 in expenses. Their counsel, Surrey and Morse, filed a separate application subsequently considered. The DAT recommends an award of 70% of fees and 100% of expenses to which applicant filed a response.

This indenture trustee's application consists of 185 hours service at a $75.00 hourly rate and also includes a request for certain annual fees of $2,513. The 185 hours reflect applicant's use of in-house personnel whose efforts are equally compensable with those of counsel. After due consideration and for reasons discussed in the ensuing application, the Court awards 70% fees amounting to $11,471.60 and expenses in full of $16,375.56, a total award of $27,847.16.

**9. Surrey and Morse** were counsel to the J. Henry Schroder Bank and Trust

Company. They applied for $232,872.50 fees and $16,878.59 expenses on their client's behalf. A premium of $50,000 is also requested. The DAT recommends 70% fees, 100% expenses and no premium, to which applicant filed a response.

Counsel was active in monitoring the proceedings and communicating with debenture holders thereby relieving debtor and its counsel of that function. Specific contributions beneficial to the estate include developing a consensual plan, assisting the compromise of appointment of the Investment Banker and aiding in litigation strategy to resolve the PBGC claims. While the majority of applicant's effort benefitted the estate, a reduction of their request is necessary due to activities solely beneficial to their client. For example, the application lists charges for preparing and filing claims for debenture holders and drafting the application for reimbursement of fees. While applicant's services generally benefitted the estate they were less crucial than those contributed by others in lead roles.

The applicant's request is for 1,943 hours service at an average hourly rate of $119.85, excluding premium. The Court, however, concurs with the DAT's assessment and adopts the recommendation. Based on the factors cited, applicant is awarded 70% of requested fees and 100% of expenses, a total of $179,889.34. There is no evidence of "extraordinary efforts and remarkable results" to justify awarding a premium which is, therefore, denied.

**10. United States Trust Company of New York and Whitman and Ransom.** United States Trust Company and counsel submitted a joint application. Request is submitted for counsel fees of $184,512 including $9,534 post-confirmation, a trust fee of $22,000 and expenses of $10,063.14 including $1,172.83 post-confirmation. The DAT recommends 70% payment of pre-confirmation fees and 100% pre-confirmation expenses with no post-confirmation award. Applicants filed a response to the DAT's recommendation.

At the inception of the case, United States Trust was indenture trustee for more than 13.6 million dollars in claims. They were a member of the Creditors' Committee and served on two sub-committees. Although active in most aspects of the proceedings, applicants' substantial contribution was limited to several critical areas. These included review of potential stock purchases, efforts in redrafting the plan to eliminate potential favoritism of large claimants and modifying the plan as to senior debenture holders thereby avoiding objections which could have delayed confirmation.

Applicants request reimbursement for 1,455 hours of attorney time at the reasonable average hourly rate of $122.45 for pre-confirmation activities. In addition to applicant's limited role in the case, they charged for filing proofs of claim and for research concerning their function. These charges are clearly non-compensable when considering substantial contribution. For these reasons the Court adopts the DAT's recommendation and awards applicant 70% of pre-confirmation fees and 100% of pre-confirmation expenses. An award for the 83 hours post-confirmation services is inappropriate. The bulk of the charges represents preparation of the fee application and issues concerning constituents under the confirmed plan. Applicant's total award, therefore, is $146,774.91.

\*     \*     \*     \*     \*     \*

The Court has reviewed in depth the voluminous applications submitted by these highly skilled professionals. The allowances have been substantiated and, under the applicable criteria, are reasonable. These awards for fees, expenses and premiums total $22,793,903.77 compared to requests for $24,064,450.33 plus interest. The magnitude of the awards diminishes in relation to the outstanding achievements produced and the benefits enjoyed by creditors and the entire estate through the talented services rendered.

The applicants' requests and allowances are detailed in the attached Exhibit "A." The following, however, is a brief summary of the total award of $22,793,903.77.

| | Request | Award |
|---|---|---|
| **LEGAL COUNSEL (18 Firms)** | | |
| Fees ............................ | $ 7,633,916.82 | $ 7,610,611.99 |
| Expenses ........................ | $ 668,856.94 | same |
| Premium and Interest ........... | $ 1,001,494.75+ | $ 777,353.90 (premiums only) |
| **ACCOUNTANTS (4 Firms)** | | |
| Fees ............................ | $ 4,048,178.00 | $ 3,942,598.40 |
| Expenses ........................ | $ 375,513.00 | same |
| Premium and Interest ........... | $ 607,000.00+ | $ 382,796.52 (premiums only) |
| **ACTUARIES (3 Firms)** | | |
| Fees ............................ | $ 146.051.00 | same |
| Expenses ........................ | $ 17,019.59 | same |
| **CREDITORS AND INDENTURE TRUSTEES** (15 Applicants and 4 Committees) | | |
| Total Fees and Expenses ........ | $ 6,320,975.32 | $ 5,850,006.82 |
| **SPECIAL MASTER** | | |
| Fees ............................ | $ 73,306.25 | $ 65,956.95 |
| Expenses ........................ | $ 2,379.63 | same |
| **EXAMINER** | | |
| Fees ............................ | $ 1,125,256.00 | same |
| Expenses ........................ | $ 47,090.00 | same |
| Premium ........................ | $ 165,000.00 | $ —0— |
| **SECRETARY TO WMC CREDITORS' COMMITTEE** | | |
| Fees | $ 24,325.00 | same |
| Expenses ........................ | $ 9,068.95 | same |
| **INVESTMENT BANKER** | | |
| Fees ............................ | $ 1,650,000.00 | same |
| Expenses ........................ | $ 69,019.08 | same |
| **TOTAL** Fees, Expenses and Premiums/Interest ............................ | $24,064,450.33 | $22,793,903.77 (no interest) |

----

Compensation is awarded accordingly.     IT IS SO ORDERED.

EXHIBIT A

| Applicant | Col. 1 Requested Fee | Col. 2 Fee Award | Col. 3 Requested Expenses | Col. 4 Expense Award | Col. 5 Premium/Interest Requested | Col. 6 Premium Award | Col. 7 Total Award | Col. 8 Interim Fee Payments | Col. 9 Interim Expense Payments | Col. 10 Amount Due |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Squire, Sanders and Dempsey | $ 2,936,243.70 | $ 2,936,243.70 | $ 262,664.70 | $ 262,664.70 | P$ 402,395.49 | $ 352,349.24 | $ 3,551,257.64 | $ 2,497,680.57 | $ 262,664.70 | $ 790,912.37 |
| 2. Levin and Weintraub and Crames | 1,816,000.00 | 1,816,000.00 | 143,856.02 | 143,856.02 | P/I 232,500.00+ | 217,920.00 | 2,177,776.02 | 1,543,600.00 | 143,856.02 | 490,320.00 |
| 3. Hahn, Loeser, Freedheim, Dean and Wellman | 1,725,705.50 | 1,725,705.50 | 130,044.43 | 130,044.43 | P/I 345,808.86 | 207,084.66 | 2,062,834.59 | 1,469,421.50 | 130,044.43 | 463,368.66 |
| 4. Kahn, Kleinman, Yanowitz and Arnson Co., L.P.A | 205,787.00 | 205,787.00 | 6,887.66 | 6,887.66 | | 0.00 | 212,674.66 | 144,050.90 | 7,189.34 | 61,434.42 |
| 5. Mansour, Gavin, Gerlack and Manos | 64,396.25 | 64,396.25 | 4,174.25 | 4,174.25 | | 0.00 | 68,570.50 | 45,077.38 | 4,174.25 | 19,318.87 |
| 6. Arter and Hadden | 161,019.50 | 161,019.50 | 30,917.56 | 30,917.56 | | 0.00 | 191,937.06 | 112,713.65 | 30,917.56 | 48,305.85 |
| 7. Nadler and Nadler Co., L.P.A. | 126,980.60 | 126,980.60 | 5,569.95 | 5,569.95 | P 20,790.40 | 0.00 | 132,550.55 | 88,946.90 | 5,569.95 | 38,033.70 |
| 8. Greene and Hennenberg | 135,000.00 | 121,500.00 | 1,890.48 | 1,890.48 | | 0.00 | 123,390.48 | 95,500.13 | 1,890.48 | 25,999.87 |
| 9. Baker and McKenzie | 98,048.28 | 88,243.45 | 32,894.32 | 32,894.32 | | 0.00 | 121,137.77 | 70,252.82 | 29,917.27 | 20,967.68 |
| 10. Schramm and Raddue | 230,042.63 | 230,042.63 | 32,623.31 | 32,623.31 | | 0.00 | 262,665.94 | 230,042.63 | 32,623.31 | 0.00 |
| 11. Cragg and Bailly, Ltd. | 17,402.50 | 17,402.50 | 6,238.12 | 6,238.12 | | 0.00 | 23,640.62 | 17,402.50 | 6,238.12 | 0.00 |
| 12. Fasken and Calvin | 47,385.00* | 47,385.00* | 3,070.70 | 3,070.70 | | 0.00 | 50,455.70 | 47,385.00 | 3,070.70 | 0.00 |
| 13. Garrity, Connolly, Lewis, Lowry and Grimes | 2,877.50 | 2,877.50 | 643.39 | 643.39 | | 0.00 | 3,320.89 | 2,877.50 | 643.39 | 0.00 |
| 14. Harries, Houser | 27,891.41 | 27,891.41 | 2,665.31 | 2,665.31 | | 0.00 | 30,556.72 | 25,323.49 | 2,646.91 | 2,586.32 |
| 15. Hughes, Hubbard and Reed | 20,721.45 | 20,721.45 | 678.37 | 678.37 | | 0.00 | 21,399.82 | 14,505.02 | 678.37 | 6,216.43 |
| 16. Locke, Reynolds, Boyd and Weisell | 945.00 | 945.00 | 19.42 | 19.42 | | 0.00 | 964.42 | 661.50 | 19.42 | 283.50 |
| 17. Lockwood, Dewey, Alex and Cummings | 1,957.00 | 1,957.00 | 239.14 | 239.14 | | 0.00 | 2,196.14 | 1,369.90 | 239.14 | 587.10 |
| 18. Watts, Hoffmann, Fisher and Henke Co., L.P.A. | 15,513.50 | 15,513.50 | 3,779.81 | 3,779.81 | | 0.00 | 19,293.31 | 11,793.21 | 3,779.81 | 3,720.29 |
| 19. Ernst and Whinney | 3,189,971.00 | 3,189,971.00 | 267,582.00 | 267,582.00 | P/I 607,000.00+ | 382,796.52 | 3,840,349.52 | 2,232,978.80 | 267,582.00 | 1,339,788.72 |
| 20. Touche Ross and Co. | 165,000.00 | 123,750.00 | 16,601.00 | 16,601.00 | | 0.00 | 140,351.00 | 60,000.00 | 16,601.00 | 63,750.00 |
| 21. Coopers and Lybrand | 371,559.00 | 371,559.00 | 35,940.00 | 35,940.00 | | 0.00 | 407,499.00 | 260,091.30 | 35,940.00 | 111,467.70 |
| 22. Peat, Marwick, Mitchell and Co. | 321,648.00 | 257,318.40 | 55,390.00 | 55,390.00 | | 0.00 | 312,708.40 | 225,153.60 | 55,390.00 | 32,164.80 |
| 23. George B. Buck Consulting Actuaries, Inc. | 60,576.00 | 60,576.00 | 3,467.00 | 3,467.00 | | 0.00 | 64,043.00 | 42,403.20 | 3,467.00 | 18,172.80 |
| 24. Milliman and Robertson, Inc. | 47,027.50 | 47,027.50 | 8,782.83 | 8,782.83 | | 0.00 | 55,810.33 | 32,919.25 | 8,782.83 | 14,108.25 |
| 25. Poulin Associates, Inc. | 38,447.50 | 38,447.50 | 4,769.76 | 4,769.76 | | 0.00 | 43,217.26 | 26,913.25 | 4,769.76 | 11,534.25 |
| 26. Lazard Freres and Co. | 1,650,000.00 | 1,650,000.00 | 69,019.08 | 69,019.08 | | 0.00 | 1,719,019.08 | 1,650,000.00 | 69,019.08 | 0.00 |
| 27. Special Master: Sam A. Zingale | 73,306.25 | 65,956.95 | 2,379.63 | 2,379.63 | | 0.00 | 68,336.58 | 51,065.00 | 2,379.63 | 14,391.95 |
| 28. Examiner: Climaco, Seminatore, & Lefkowitz | 1,125,256.00 | 1,125,256.00 | 77,090.00 | 77,090.00 | P 165,000.00 | 0.00 | 1,202,346.00 | 787,679.00 | 76,598.00 | 338,069.00 |
| 29. Stanley Tulchin Associates | 24,325.00 | 24,325.00 | 9,068.95 | 9,068.95 | | 0.00 | 33,393.95 | 12,215.00 | 9,068.95 | 12,110.00 |
| 30. WMC Creditors' Committee | 0.00 | 0.00 | 208,881.49 | 208,881.49 | | 0.00 | 208,881.49 | 0.00 | 206,147.49 | 2,734.00 |
| 31. WMCC Creditors' Committee | 0.00 | 0.00 | 73,750.17 | 73,750.17 | | 0.00 | 73,750.17 | 0.00 | 73,750.17 | 0.00 |
| 32. WMC Equity Security Holders' Committee | 0.00 | 0.00 | 1,876.33 | 1,876.33 | | 0.00 | 1,876.33 | 0.00 | 1,876.33 | 0.00 |
| 33. WMC Employee Creditors' Committee | 0.00 | 0.00 | 3,288.88 | 3,288.88 | | 0.00 | 3,288.88 | 0.00 | 3,288.88 | 0.00 |
| 34. Citibank, N.A. | 696,932.48 | 696,932.48 | 109,122.49 | 109,122.49 | | 0.00 | 806,054.97 | 0.00 | 0.00 | 806,054.97 |
| 35. Weil, Gotshal and Manges | 620,177.80 | 620,177.80 | 61,558.53 | 61,558.53 | | 0.00 | 681,736.33 | 0.00 | 0.00 | 681,736.33 |
| 36. Kramer, Levin, Nessen, Kamin and Frankel | 240,205.00 | ** | 7,041.12 | ** | | 0.00 | 224,311.46 | 0.00 | 0.00 | 224,311.46 |
| 37. Zalkin, Rodin and Goodman | 272,456.92 | ** | 38,374.98 | ** | | 0.00 | 287,897.24 | 0.00 | 0.00 | 287,897.24 |
| 38. Citibank, N.A. | 1,491,674.80 | 1,389,547.20 | 147,307.04 | 147,307.04 | | 0.00 | 1,536,854.24 | 0.00 | 0.00 | 1,536,854.24 |
| 39. Wachtell, Lipton, Rosen and Katz | 997,409.25 | 997,409.25 | 70,884.14 | 70,884.14 | | 0.00 | 1,068,293.39 | 0.00 | 0.00 | 1,068,293.39 |
| 40. Fried, Frank, Harris Shriver and Jacobson | 275,000.00 | 206,250.00 | 20,951.23 | 20,951.23 | | 0.00 | 227,201.23 | 0.00 | 0.00 | 227,201.23 |
| 41. Eaton Corporation | 24,124.25 | 24,124.25 | 227.12 | 227.12 | | 0.00 | 24,351.37 | 0.00 | 0.00 | 24,351.37 |
| 42. Equitable Life Assurance Society of U.S. | 78,050.00 | 39,025.00 | 0.00 | 0.00 | | 0.00 | 39,025.00 | 0.00 | 0.00 | 39,025.00 |
| 43. Kronish, Lieb, Shainswit, Weiner and Hellman | 27,329.00 | 12,298.05 | 2,074.89 | 2,074.89 | | 0.00 | 14,372.94 | 0.00 | 0.00 | 14,372.94 |
| 44. UAW | 333,249.00 | 277,661.75 | 19,938.62 | 19,938.62 | | 0.00 | 297,600.37 | 0.00 | 0.00 | 297,600.37 |
| 45. J. Henry Schroder Bank and Trust Company | 16,388.00 | 11,471.60 | 16,375.56 | 16,375.56 | | 0.00 | 27,847.16 | 0.00 | 0.00 | 27,847.16 |
| 46. Surrey and Morse | 232,872.50 | 163,010.75 | 16,878.59 | 16,878.59 | P 50,000.00 | 0.00 | 179,889.34 | 0.00 | 0.00 | 179,889.34 |
| 47. U.S. Trust Co. of N.Y. (Whitman and Ransom) | 206,542.00 | 137,884.50 | 10,063.14 | 8,890.31 | | 0.00 | 146,774.91 | 0.00 | 0.00 | 146,774.91 |
| Totals | $20,213,414.07 | $19,140,592.07*** | $2,027,541.51 | $1,980,952.58*** | $1,823,494.75+ | $1,160,150.42 | $22,793,903.77 | $11,800,023.00 | $1,500,824.29 | $9,493,056.48 |

TOTAL FEES AND EXPENSES REQUESTED
$24,064,450.33 + INTEREST

* Canadian Currency.

** Award is not apportioned between fees and expenses.

*** These Totals are understated since awards to applicants #36 and #37 were not apportioned between fees and expenses. (See pages 22-23 of Memorandum). The Total award in Column #7 accurately reflects awards to these applicants.